**J. T. SLOCOMB COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 189, Docket 28184.**

United States Court of Appeals
Second Circuit.

Argued Jan. 30, 1964.

Decided June 30, 1964.

Boris Kostelanetz, New York City (Corcoran, Kostelanetz & Gladstone, New York City, on the brief; Jules Ritholz, Lloyd A. Hale and Jon H. Hammer, New York City, of counsel), for petitioner.

Norman H. Wolfe, Attorney, U. S. Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, attorneys, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and WATERMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge:

The principal question presented on this petition is whether the Tax Court was justified in finding that the acquisition of the J. T. Slocomb Company by the shareholders of Green Machine Co., Inc. and Turbo Industries, Inc., and the subsequent merger of Green and Turbo into Slocomb was for the "principal purpose * * * [of] evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit or allowance which such person or corporation would not otherwise enjoy." Internal Revenue Code of 1954, § 269.[1] A subsidiary question is whether the corporation is entitled to deduct interest on a corporate obligation which the new shareholders acquired at the time they purchased control of the corporation.

We summarize the principal facts found by the Tax Court as follows. The J. T. Slocomb Company, a Rhode Island corporation, was incorporated in 1902 and for many years engaged in the business of manufacturing micrometers and center drills in a plant in Providence, Rhode Island. It was considered one of the four leading micrometer manufacturers in the United States, and its products enjoyed a high reputation for quality in the trade. Its capital stock in 1952 was owned entirely by Donald and William B. McSkimmon, the latter of whom died on March 11, 1953. Although the company was an important factor in the industry it operated at a loss from 1944 to 1953, and in October 1952 went into receivership. A mortgage on the property was then placed with one Albert Shore, d/b/a Trenton Finance Corp., in the sum of $142,000 and the proceeds were used to satisfy creditors' claims.

On October 30, 1953, Shore and Slocomb agreed with Aaron Krock & Co., auctioneers, to sell the company's properties at auction in order to satisfy the

1. Section 269(a) "IN GENERAL.—If—
    "(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
    "(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."

mortgage. The auction was held on November 19, 1953, and there were then sold all of the company's real estate, most of its machinery and machine tools, its raw materials, finished goods inventory, and office equipment. The remaining assets, which included name and good will, forging dies, jigs, milling fixtures, casting patterns, customers' lists, part drawings, consignment inventory and accounts receivable were retained by the company. However, its entire capital stock, and all shareholders' claims against Slocomb, were sold on December 9, 1953 to the National Printing Company for a total amount of $7,300, on which the auctioneer received a commission of 7½%. As of December 31, 1953, Slocomb's available net operating loss carry forward for income tax purposes, from the years 1950-1953, was $332,080.87.

Shortly after these events, National Printing Co. transferred the stock and debt which it held in Slocomb to the shareholders of Green and Turbo. The stock of these two corporations was owned by five individuals in the same ratio: four owned 21.62% each and one owned 13.52%. Both were Connecticut corporations with their offices in South Glastonbury, Connecticut. Green had been organized in 1946 and was engaged in the manufacture of precision parts for jet aircraft engines, principally as a subcontractor for Pratt & Whitney Aircraft Co. Turbo had been organized in May 1951 and was a developer of instrumentation techniques for aircraft; nearly all of its business came either from Pratt & Whitney or as a subcontractor from Green. The management of these two corporations had long been unhappy about their dependence on one large source of business, and had made numerous efforts to diversify into another line; some of these were concerned with aviation-related products but others were in a wholly different field of activity.

Prior to December 1953, the Green and Turbo managements were aware of Slocomb generally as a well-known and accepted manufacturer of micrometers. On or about December 10, 1953, Harley J. Brook, one of the officers of Green and Turbo, received a telephone call from a Mr. Albrecht, an attorney in Hartford who informed him that the J. T. Slocomb Company was for sale, at an asking price of $30,000. The attorney mentioned that Slocomb had a large loss carry-forward. Soon afterward two officers of Green and Turbo corporation went to Providence for a meeting with an agent for National Printing, then the owner of Slocomb's stock, and with Joseph Goodman, Slocomb's sales manager. After a discussion of the company's affairs, an inspection of what it had retained after the auction, and a check of its books, the men went back to Hartford and reported favorably on the prospects of manufacturing micrometers, using the Slocomb jigs and dies on machines at Green's plant in Glastonbury or through subcontracting facilities. The purchase of the stock from National was consummated on December 21. Slocomb's new management took steps to ascertain the state of the inventory on consignment, made contact with numerous suppliers, went ahead with development of a new, easier-reading type of micrometer called the "speedmike," and continued to service micrometers that were periodically sent back to the manufacturer for repair and adjustment. They transferred all phases of the micrometer business to the Connecticut plant, and retained only Mr. Goodman of the old employees.

Gross sales of micrometers and repairs dropped from $116,323.98 in 1953 to $41,396.04 in 1954, although they nearly doubled from that figure in 1955. By contrast, gross sales of the Green and Turbo divisions were $687,490.32 in 1953, $968,620.49 in 1954 and $1,291,-856.27 in 1955.[2]

2. No evidence was introduced at the trial to permit a finding on what proportion of the post-merger profits was derived from the former Green and Turbo operations and what proportion from the micrometer business, and no such finding was made.

Green, Turbo, and Slocomb were merged into a single corporation on March 1, 1954. According to the petitioner's testimony, this was done to avoid bookkeeping costs and for other administrative reasons, and to keep the benefit of the Slocomb name, which was by far the best known of the three.

For the calendar year 1954, the merged corporation reported taxable income of $44,434.29 before a net operating loss deduction of that amount, thus eliminating all tax liability; for the calendar year 1955, the corporation reported a net income before net operating loss deduction of $136,355.49 and a deduction of that amount. The net operating loss deductions for both years were denied in full by the Commissioner.

The facts relating to the interest deduction issue are as follows. Slocomb had accumulated an indebtedness of $166,766.62 to its former shareholders, the McSkimmons, which was carried on the books of the company in part as notes and in part as an open account. This debt was transferred to the National Printing Company on December 9. On December 19, after the purchase of the stock by the Green and Turbo group had been arranged, this debt was translated into a six percent, five year debenture bond in the amount of $160,700 dated December 19. The bond was transferred to Harley J. Brook, as trustee, and was then exchanged for six bonds of smaller denominations, five of which went to the new shareholders in proportion to their stock ownership, and one, in the sum of $9,000, to the corporation's attorney. The corporation claimed interest deductions of $270 and $5,361 on its 1954 and 1955 tax returns, respectively, which were disallowed.

Having reviewed these facts, the Tax Court found that the transaction had both a business purpose and a tax evasion or avoidance purpose. Holding that the taxpayer had the burden of persuasion on the issue of which purpose was dominant, the court concluded that it failed to demonstrate that tax avoidance was not the principal purpose and therefore sustained the deficiency.

■ For convenience, we deal first with the petitioner's argument that, under the circumstances of this case, the burden was misplaced. This rests on the contention that, in the notice of deficiency, the merger of Slocomb, Green and Turbo was cited as the event having the proscribed purpose, to allow the merging corporations to avoid themselves of Slocomb's unused net operating losses, citing section 129 of the Internal Revenue Code of 1939, while, in the briefs filed after the hearing before the Tax Court and in this Court, the Government claimed that the acquisition of Slocomb's stock was for the purpose of securing to the new shareholder the benefit of Slocomb's loss carryover, citing section 269 of the Internal Revenue Code of 1954. We think the argument is purely technical, and does not go to the heart of the matter. The petitioner was in no way misled or unprepared to meet the argument based on the acquisition of stock. The stipulation of facts entered into by the parties, the testimony of the four witnesses called by petitioner and the exhibits introduced in evidence all related far more to the events preceding the acquisition than to the events surrounding the merger. In view of the related character of the two transactions, we can see no prejudicial error in the Government's change of focus as to the event which called the statute into operation. The relevant language of the 1939 and 1954 Code provisions is identical. Cf. Coastal Oil Storage Co. v. Commissioner, 242 F.2d 396, 400 (4 Cir. 1957).

■■ Coming to the merits of the dispute between the parties, we must first emphasize the principle that the question whether a transaction had tax avoidance as its principal purpose is a question of fact on which the taxpayer has the burden of persuading the trier of fact. American Pipe & Steel Co. v. Commissioner, 243 F.2d 125 (9 Cir.), cert. denied, 355 U.S. 906, 78 S.Ct. 333, 2 L.Ed.2d 261 (1957); Thomas E. Sny-

der Sons Co. v. Commissioner, 288 F.2d 36 (7 Cir.), cert. denied, 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 28 (1961); Elko Realty Co. v. Commissioner, 260 F.2d 949 (3 Cir. 1958). The corollary, of course, is that a finding of tax avoidance purpose may not be set aside unless it is clearly erroneous. Rule 52, F.R.Civ.P.; Internal Revenue Code of 1954, section 7482. On the other hand, such finding must have substantial support in the record, including the inferences reasonably to be drawn from the evidence, for it to stand.

█ As we have said, the government here contends that section 269(a) (1) which relates to the acquisition of control of a corporation by any person for the purpose of securing the benefit of a deduction which he would not otherwise enjoy, applies to bar the deduction claimed here. Preliminarily, we note that, in this case, the acquisition itself would not have produced any tax benefit to the acquiring shareholders. The further step of merging Slocomb, Green and Turbo was necessary to permit Slocomb's pre-acquisition losses to offset future Green and Turbo profits. However, it seems clear that if the merger was an integral component of the entire plan, we may look to the end result and determine the issues from the factual situation which existed then. The Tax Court's opinion considers the two transactions as integral steps of a single plan, and petitioner does not challenge this approach.[3]

█ We next reach the question whether substantial evidence supports the finding that tax avoidance was the primary purpose of the acquisition and merger. Petitioner appears to contend broadly that wherever the business of the loss corporation is continued by the new shareholders, instead of being abandoned, such a finding is unjustified. It

is indeed true that most of the cases thus far have involved a complete cessation of the loss-producing activities and the substitution of an entirely new business venture. See Mill Ridge Coal Co. v. Patterson, 264 F.2d 713 (5 Cir. 1959); Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., 278 F.2d 392 (9 Cir. 1960); Thomas E. Snyder Sons Co. v. Commissioner, 288 F.2d 36 (7 Cir.), cert. denied, 368 U.S. 823, 82 S.Ct. 41 (1961); Urban Redevelopment Corp. v. Commissioner, 294 F.2d 328 (4 Cir. 1961); J. G. Dudley Co. v. Commissioner, 298 F.2d 750 (4 Cir. 1962). On the other hand, in F. C. Publication Liquidating Corp. v. Commissioner, 304 F.2d 779 (2 Cir. 1962) and notably in R. P. Collins & Co. v. United States, 303 F.2d 142 (1 Cir. 1962), there was evidence of attempts to continue the loss corporation's business for a time, which eventually were abandoned. In Elko Realty Co. v. Commissioner, 29 T.C. 1012, aff'd per curiam, 260 F.2d 949 (3 Cir. 1958), the loss corporation's former business was continued during all the years for which a net operating loss deduction was sought, and the amount of profit which had been earned by the other corporation was not especially great. Nevertheless, the Tax Court found tax avoidance to be the principal purpose of the acquisition of control, and this decision was upheld on review. The mere fact that the loss corporation's business continues after the acquisition is not determinative of the issue of principal purpose.

█ We agree with the taxpayer's position to the extent that we think the continuation of the loss corporation's business, even when it is conducted, as here, in a new location and with entirely new personnel, is certainly relevant in considering whether tax evasion was the principal purpose of a transaction which

---

3. Any contrary treatment would open a large loophole in the law. Suppose shareholders of a profitable corporation were to acquire control of a "shell" whose only asset was a large loss carryover, and later merge the two corporations. If we consider only the merger as the event with the tax evasion purpose, the "common control" exception in section 269(a) (2) might take the case out of the statute.

ultimately brings the profitable corporation or its shareholders the benefit of its deduction. We also agree that the acquisition of Slocomb's stock and the continuation of its business under the circumstances set forth above might well have been a justifiable step even if Slocomb had no history of operating losses and there were no deductions to be gained from its acquisition. But the statute expressly speaks of "principal purpose," not "sole purpose," and that question must be deemed primarily for the Tax Court or other trier of fact to determine. We believe that the other aspects of the transactions under review, including the large carryover, of which the new shareholders were aware when they decided to enter the deal, the rapidity with which they moved to make those losses available to Green and Turbo, and the modest scope of the micrometer business compared to the subcontracting business after the merger, preclude a judgment that the Tax Court's finding was clearly erroneous.

Finally, we reach the question of the disallowance of the interest deductions on the Slocomb debentures which had been issued to the new shareholders and to Mr. Albrecht. It has been held, correctly we think, that where the principal purpose of a transaction within the scope of section 269 is to secure a tax benefit, then any tax benefits which the acquiring corporation or shareholder would not have been entitled to but for the acquisition should also be disallowed. The disallowance is not restricted to the deduction in which the acquiring parties were primarily interested. R. P. Collins & Co. v. United States, 303 F.2d 142 (1 Cir. 1962); Brown Dynalube Co. v. Commissioner, 297 F.2d 915 (4 Cir. 1962). The fact that interest at 6% on debenture bonds could produce almost $10,000 in annual interest deductions to the shareholders for a total investment of $30,000 lends additional support to this conclusion.[4] That a valid debt could be created in these circumstances is most doubtful. See Gilbert v. Commissioner, 248 F.2d 399 (2 Cir. 1957); Nassau Lens Co. v. Commissioner, 308 F.2d 39 (2 Cir. 1962).

Judgment affirmed.

---

4. The actual deductions claimed were, of course, substantially less than this figure.