**BRIAR HOMES CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 14626.**

United States District Court
D. Maryland.

Sept. 23, 1965.

Stanley H. Wilen and A. Fred Freedman, and G. C. A. Anderson, Baltimore, Md. (Burke, Gerber & Wilen, and Anderson, Coe & King, Baltimore, Md., on brief), for plaintiff.

Moshe Schuldinger and Allen Schwait, Attys., Dept. of Justice, Washington, D. C. (John B. Jones, Jr., Acting Asst. Atty. Gen., C. Moxley Feathuston, David A. Wilson, Jr., Attys., Dept. of Justice, Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, First Asst. U. S. Atty., Baltimore, Md., on brief), for defendant.

WINTER, District Judge.

Briar Homes Corporation (Briar Homes) sues to recover Federal income taxes, in the aggregate amount of $86,240.52, with interest, collected from it for the fiscal years ended May 31, 1952, May 31, 1953, and May 31, 1954. Evidence has been received, briefs filed,

argument heard, and the matter submitted for decision.

Briar Homes was incorporated as a Maryland corporation on June 15, 1946. Shortly thereafter, it purchased from the Federal Housing Administration a multiple unit rental housing project, called "Briarfield Manor," located at Warwick, Virginia, then a small community outside Newport News, Virginia, and now incorporated into Newport News. The consideration for the purchase was $1,440,112.00, financed by a 31-year F.H.A. mortgage for 100% of the purchase price. On its books Briar Homes allocated $50,000.00 to the cost of land, and the balance to buildings and equipment. On buildings Briar Homes claimed a 20-year useful life and computed depreciation on that basis. As a result of an audit by the engineering and valuation section of the Internal Revenue Service in 1949, the useful life of the buildings was subsequently increased to 21 years.

In 1949, almost adjacent to Briarfield Manor, another F.H.A. project, called "Warwick Gardens," was constructed. Immediately behind Warwick Gardens, and so close as to be contiguous to Briarfield Manor, was built a third similar project, called "Warwick Gardens Number Two." The two Warwick Gardens projects were promoted by persons other than Briar Homes or the principals of Briar Homes.

Warwick Gardens Number Two was not successful financially, and the mortgagee foreclosed its mortgage. Since the mortgage had been guaranteed by F.H.A., title to the property ultimately vested in the latter.

In 1952, F.H.A. concluded to sell Warwick Gardens Number Two. At the initial offering bids were submitted by the owners of Warwick Gardens and by one of the principals of Briar Homes. The initial bids were rejected, and the property was reoffered a second and a third time. It was ultimately sold, on September 7, 1951, to one of the principals of Briar Homes, acting as agent for a corporation to be formed. From the time of the acceptance of the offer until settlement, this principal operated Warwick Gardens Number Two under lease from the Federal Housing Administrator.

On October 25, 1951, Arlington Apartments Corporation (hereafter called "Arlington") was organized. All of the voting common stock was subscribed and paid for by Briar Homes. Five shares of nonvoting preferred stock was issued to F.H.A. Arlington was formed to take title to Warwick Gardens Number Two, and title was conveyed to it on December 10, 1951, for the consideration of $2,040,000.00. Of that sum $100,000.00 had been paid in cash prior to settlement, and F.H.A. took a mortgage for the balance of the purchase price, in the amount of $1,940,000.00. At settlement adjustments were made as of August 1, 1951.

Since settlement on December 10, 1951 was made as of August 1, 1951, but in the interim the project had been in operation, there was, on the date of actual settlement, the net sum of $43,666.94 derived from operations. This sum was used to reduce Arlington's principal obligation under its mortgage. For its fiscal year ended May 31, 1952, Arlington did not report this sum as income; instead it applied the proceeds to the building account in reduction of the cost basis.

Of the total consideration paid by Arlington, $75,000.00 was allocated on its books to land, and the remainder to buildings and equipment. Twenty-five years was chosen as the useful life of the buildings, and annual depreciation has been computed on that basis.

For each of the three fiscal years in question, Briar Homes filed a consolidated income tax return reflecting the results of its operation of Briarfield Manor and the results of its wholly-owned subsidiary's operation of Warwick Gardens Number Two. For each of the three years Briar Homes had a relatively constant net income in excess of $60,000.00, but Arlington had a net loss amounting to $50,755.51 for the fiscal year ended May 31, 1952, $39,411.09 for the fiscal year ended May 31, 1953,

and $39,808.22 for the fiscal year ended May 31, 1954. The effect of combining the results of these two operations was to reduce Briar Homes' overall taxable income to $13,144.28 for fiscal 1952, $24,784.95 for fiscal 1953, and $22,576.47 for fiscal 1954.

Upon audit of Briar Homes' consolidated returns for each of these years, the revenue agent recommended disallowance of Arlington's losses by reason of a claimed application of § 129 of the Internal Revenue Code of 1939 added by ch. 63, 58 Stat. 47 (1944), to which provides for the disallowance to acquiring corporations of deductions from corporations principally acquired for the purpose of evasion or avoidance of income taxes. The Appellate Division of the Internal Revenue Service asserted an alternate and additional basis for assessment by increasing the useful life of Arlington buildings to 40 years, instead of the 25 years reported by Briar Homes, and allocating $135,000.00 of the purchase price as the cost of land, rather than $75,000.00 allocated by Briar Homes. It also adjusted the useful life of the Briarfield Manor buildings as of their date of acquisition by Briar Homes to 30⅓ years, instead of 21 years which had been agreed upon as a result of the audit, and allocated $100,000.00 of the initial purchase price as the value of the land, instead of $50,000.00 assigned to land by Briar Homes.[1] Additionally, the net amount received from the operation of Warwick Gardens Number Two during the period August 1, 1951 to December 10, 1951, i. e., $43,666.91, was included in Arlington's income and restored to Arlington's claimed cost basis for the purpose of computing depreciation. There were assessed deficiencies computed from the changes herein described, with interest, and these were paid and suit filed after timely claims for refund were refused. Additional facts, as disclosed by the evidence, will be stated in connection with the issue to which they relate.

There are presented for decision the following questions: (1) may Briar Homes deduct losses of its wholly-owned subsidiary Arlington on its consolidated income tax return for the years in suit; (2) did Briar Homes improperly compute depreciation for the tax years in question as a result of an improper allocation of cost to land, or an improper determination of the useful life of its buildings, or both, with respect to Briarfield Manor; (3) did Briar Homes improperly compute depreciation for the tax years in question as a result of an improper allocation of cost to land, or an improper determination of the useful life of its buildings, or both, with respect

---

1. In its initial answer to the complaint, defendant did not specifically plead that Briar Homes adopted an improper useful life for Briarfield Manor in computing depreciation. After a pretrial conference, during which counsel for defendant stated that no issues in addition to those raised by the pleadings were present in the litigation, defendant moved to amend its answer to assert that Briar Homes erroneously and illegally used a 21-year useful life instead of a 40-year life. For reasons set forth in a Memorandum and Order dated February 23, 1965, the Court denied defendant's motion to amend. In a brief filed by defendant in support of its motion to amend its answer defendant stated that it would offer proof at the trial that the useful life of Briarfield Manor was 40 years, and that a proper allocation of purchase price to land for Briarfield Manor and Warwick Gardens Number Two each was in excess of $200,000.00. Defendant contended that it was entitled to a set-off on these bases.

At trial defendant did not tender evidence to show that the useful life of Briarfield Manor was 40 years, although it did offer evidence to support the Commissioner's determination of the proper useful life. Defendant did tender, and was permitted to present, evidence that the proper allocation of cost between Briarfield Manor and the land on which it is constructed, and between Warwick Gardens Number Two and its land would assign a higher value to land than that determined by the Commissioner. Briar Homes presented opposing evidence on these two allocation issues where defendant might be entitled to a set-off, and they have been fully briefed and argued. The Court will, therefore, treat these issues as presented by the litigation and decide them.

to Warwick Gardens Number Two; and (4) should the net sum of $43,666.91, derived from the operation of Warwick Gardens Number Two in the period August 1, 1951 to December 10, 1951 be treated as income to Arlington, or a reduction of the purchase price of the property?

## I

Defendant resists Briar Homes' enjoyment of the tax benefits of a consolidated income tax return on the basis of § 129 of the Internal Revenue Code of 1939, added by ch. 63, 58 Stat. 47 (1944), the pertinent portion of which is set forth in the margin.[2] It is now substantially codified as § 269 of the Internal Revenue Code of 1954. From the emphasis added to the quotation of the text of the statute, it appears that, when otherwise applicable, the statute becomes operative when "the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax * * *." The legislative history of the statute supports the interpretation that the taxpayer's *principal* purpose must be that of tax evasion or avoidance. This is so, because, as originally considered, the statute would have been applicable whenever the Commissioner found that "one of the principal purposes" for which the acquisition was made was the avoidance of Federal income tax, but, when considered by the Senate and the Conference Committee, the bill was amended to eliminate the necessity of a finding by the Commissioner and, further, to eliminate the phrase "one of" so that, as finally enacted, the statute to be operative requires that *the* principal

purpose of the acquisition is avoidance or evasion of Federal income tax. See, S.Rep.No.627, 78th Cong., 1st Sess. 59–60 (1943) (1944 Cum.Bull. 973, 1016–17), and H.R.Conf.Rep.No.1079, 78th Cong., 2d Sess. 55 (1944) (1944 Cum. Bull. 1059, 1070).

Although the Internal Revenue Code of 1939, § 141 permitted the filing of consolidated returns when certain conditions were met, the tax benefit which could be derived from offsetting the losses of one affiliate against profits of another affiliate has been held unavailable to corporations where § 129 has been found applicable. R. P. Collins & Co. v. United States, 303 F.2d 142 (1 Cir. 1962); Elko Realty Co. v. Commissioner of Internal Revenue, 29 T.C. 1012 (1958), aff'd per curiam, 260 F.2d 949 (3 Cir. 1958); American Pipe & Steel Corp. v. Commissioner of Internal Revenue, 243 F.2d 125 (9 Cir. 1957); 8A Merten's Law of Federal Income Taxation § 46.09 (rev.ed. 1964).

Among the circuits there have been somewhat divergent views as to the type of loss which § 129 was designed to outlaw. In R. P. Collins & Co. v. United States, supra, and Elko Realty Co. v. Commissioner of Internal Revenue, supra, the First and Third Circuits did not require that the economic loss be realized prior to acquisition. Zanesville Investment Co. v. Commissioner of Internal Revenue, 335 F.2d 507, 508 (6 Cir. 1964), on the other hand, would make § 129 inapplicable to "actual cash losses incurred both economically and taxwise after the affiliation" if these losses were offset against post-affiliation profits of another group member. Defendant urg-

---

**2.** "§ 129. Acquisitions made to evade or avoid income or excess profits tax.

"(a) Disallowance of deduction, credit, or allowance. If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately prior to such acquisition, by such acquiring corporation or its stockholders, the basis of which prop-

erty, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, *and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *"*

es that, in the light of the legislative history of § 129, this Court should not follow the views of the Sixth Circuit. It is unnecessary, however, to decide this question.

By its terms § 129 applies when three basic conditions are met, viz., (1) the taxpayer must acquire control of the corporation or or after October 8, 1940, (2) the principal purpose of such acquisition must be evasion or avoidance of Federal income or excess profits taxes, and (3) the taxpayer must secure thereby a deduction, credit or allowance not otherwise available. In this case there is no question but that the first condition has been met. Briar Homes "acquired" Arlington after 1940, because it has been held that the acquisition of the controlling stock of a newly-organized corporation is considered to be an acquisition of control within the meaning of § 129. James Realty Co. v. United States, 280 F.2d 394 (8 Cir. 1960); Coastal Oil Storage Co. v. Commissioner of Internal Revenue, 242 F.2d 396 (4 Cir. 1957).

Nor is there any question but that in this case the third condition has also been satisfied, because Briar Homes, by acquiring Arlington, gained the benefit of filing a consolidated income tax return and of offsetting Arlington's losses against Briar Homes' profits, with a resulting diminution of tax liability.

The case therefore resolves itself into the question of fact as to whether the second condition has also been met. That is to say, whether the principal purpose of Briar Homes in acquiring Arlington was to evade or avoid Federal income taxes, an issue on which the taxpayer has the burden of persuading the trier of fact. J. T. Slocomb Company v. Commissioner of Internal Revenue, 334 F.2d 269, 273 (2 Cir. 1964).

When weighed and considered, the evidence convinces the Court, and the Court so finds, that Arlington was acquired for a variety of reasons, but that the principal reason for its acquisition was not avoidance or evasion of Federal income taxes. This finding is based primarily upon the testimony of one of Briar Homes' witnesses, Mr. Ben Cohen, President of Briar Homes, who described himself and his brother as real estate investors and builders, building for their own investments and for outsiders, and also as persons engaged in managing apartments and buildings. Mr. Cohen and his brother are the principal stockholders of Briar Homes.

Mr. Cohen described in some detail how, in 1946, he succeeded in buying Briarfield Manor after it had been constructed and operated unprofitably by its former owner, the mortgage had been foreclosed, and the property offered for sale by the Federal Housing Administration. Mr. Cohen's brother was dubious about this purchase, but when Mr. Cohen offered to complete the transaction alone, his brother concluded to be a coinvestor. Notwithstanding the poor operating results of the former owners, the poor condition of the property when it was acquired, its basically poor construction, and the number of improvements which were required, Briar Homes, under the direction and management of Mr. Cohen and his brother, made Briarfield Manor a complete financial success. Indeed, Mr. Cohen stated that he had operated Briarfield Manor " * * * very successfully, and we had a few jealous people that thought they were asleep when we bought it."

In 1951 when, within two blocks of Briarfield Manor, Warwick Gardens Number Two was offered for sale, Mr. Cohen was moved to bid on it for several reasons. He considered himself a successful operator of that type of rental project. He wanted to acquire more apartments. He thought, also, that there was a chance that he could acquire Warwick Gardens and thus own all similar rental properties in a given area, and that Warwick Gardens Number Two would be a financial success. In connection with the latter, it was his belief that Warwick Gardens Number Two could be operated with the same staff which operated Briarfield Manor and another similar project, known as "River Drive

Apartments," about a mile distant from Briarfield Manor, thus reducing the overhead cost in the operation of existing properties and bringing about greater efficiency in the use of maintenance employees. Another factor which he considered was that, in his view, Briarfield Manor and Warwick Gardens Number Two were competitive, in that they appealed to the same segment of the renting public, i. e., soldiers, sailors and shipyard workers. With this belief, he thought that he could increase the number of tenancies at Briarfield Manor by buying up part of its competition, and also be in a position to increase rents at Briarfield Manor without losing tenants to its competitor.

Mr. Cohen flatly denied that he gave thought to the tax consequences of the acquisition, or made any computations, or obtained advice, to ascertain any possible tax savings. He described his underlying motive as one of making a profit, and he described making a profit as obtaining a return of money invested in five years. In fact, Arlington returned the loan made to finance its purchase of Warwick Gardens Number Two within that period, so that, by his test, Mr. Cohen realized his objective.

Prior to making the successful bid to purchase Warwick Gardens Number Two, Mr. Cohen made a projection of revenues and expenses. He knew that Warwick Gardens Number Two was fully rented at the time that Arlington acquired it. Indeed, the F.H.A. offering circular and advertisement, dated June 26, 1951, disclosed the amounts of real estate taxes, sewer charges, garbage collection costs and insurance premiums, and stated the amounts of rents for various types of apartments, together with the representation, "While occupancy failed to meet expectancy originally, due primarily to general economic conditions in the area, rental rates were not decreased and subsequently occupancy has been built up so that the property has now 100% occupancy at the above rates." Two later offering circulars repeated this data and this representation. Mr. Cohen

contemplated that cash revenues would exceed cash expenses by $94,000.00 per year. This $94,000.00 would be equivalent to straight line depreciation on the buildings, and this sum would be available to pay amortization on the mortgage loan which would be required, an amount which he estimated at $40,000.00 per year, and the balance available as free cash. Moreover, if approximately one hundred of the apartments were furnished, additional revenues of $15,000.00 per year could be realized.

Arlington was formed, and took title to Warwick Gardens Number Two because of a requirement of the F.H.A. that there be a separate corporation to take title to the property. Prior to his successful bid, Mr. Cohen was sufficiently sure of the prospect of financial success to offer to pledge the equity in River Drive Apartments as additional security for a mortgage loan to Arlington.

Having the advantage of hindsight and knowing that in fact Arlington's operation of Warwick Gardens Number Two was not a financial success, defendant presented evidence, largely circumstantial, to show that Briar Homes, acting through Mr. Cohen, had invidious tax motives in acquiring Warwick Gardens Number Two. Evidence was offered to show that Mr. Cohen must have known that the occupancy rate at Warwick Gardens Number Two could not remain at 100% and, further, that he must have known that Warwick Gardens (which was built directly in front of Warwick Gardens Number Two), in the hands of adverse interests, would interfere greatly with the ability to rent apartments in Warwick Gardens Number Two. At the time that the first bid for Warwick Gardens Number Two was made, Mr. Cohen bid $5,000.00 more than the bid submitted by the other bidders—the owners of Warwick Gardens—and there was testimony from the former director of the Property Management Division of F.H.A. that Mr. Cohen's bid was rejected because the $5,000.00 difference " * * * wouldn't be compensated for by the difficulty Mr. Cohen would have in trying

to operate this project under the guns of * * * his competitor." It should be remarked, however, parenthetically, that when the owners of Warwick Gardens lost interest after their first bid was rejected and refused to bid on the second or third offerings, the F.H.A. was not deterred in selling the property to Arlington and to granting Arlington a 100% mortgage.

The inferences to be drawn from the defendant's testimony of what Mr. Cohen must have known about future occupancy are counterbalanced by another consideration. True it is that Warwick Gardens Number Two after acquisition by Arlington realized a very low rate of occupancy, but this experience was attributable principally to a factor other than the mere physical location of Warwick Gardens. Mr. Cohen thought that he had a real opportunity to acquire Warwick Gardens. While he was not successful in this regard, and ultimately Warwick Gardens Number Two was sold to the owners of Warwick Gardens, after the tax years in question, there was little basis upon which Mr. Cohen could anticipate that the owners of Warwick Gardens would exhibit the resentment and active opposition to Arlington's acquisition of Warwick Gardens Number Two as, in fact, was experienced. Because of the physical location of the two projects, a person desiring to rent from Arlington would be required to pass through Warwick Gardens. If Warwick Gardens had a rental office and it, of course, did, to rent its own apartments, it would be a natural thing for a prospective tenant to make his initial inquiry at this rental office. It is clear that persons making such an inquiry were not told where Warwick Gardens Number Two was located. Rather, they were shown apartments in Warwick Gardens and, if Warwick Gardens had no vacancies, they were referred to other properties owned by the persons owning Warwick Gardens. Indeed, Mr. E. E. Falk, one of the principals of Warwick Gardens, testified,

" * * * I was determined that if I could have anything to do with it, that it [Warwick Gardens Number Two] would not be a successful investment for him, and instructed my people in the first office to do everything possible to divert tenants away from him." In short, Mr. Cohen is charged with knowledge of the physical location of the properties, but only subsequent events, not predictable at the time of acquisition, made physical location such an important factor. These events could not have been known by Mr. Cohen, so that his testimony as to his optimism about acquisition of the property is not substantially impaired.

Defendant stresses that the evidence shows that, based upon varying assumptions as to the rate of occupancy and useful life of the buildings, the depreciation losses that Warwick Gardens Number Two would generate were predictable, were anticipated by Mr. Cohen and, significantly, were such, based upon actual occupancy, that Arlington could not show a profit in the period 1952 through 1959, unless straight line depreciation with a 40-year life was used. While these projections are interesting as academic exercises, there is no showing, despite the defendant's claim, that these results were anticipated by Mr. Cohen. Mr. Cohen testified fully and fairly that he projected an excess of cash revenues over cash expenses, in the amount of $94,000.00 per year, and that of this sum approximately $40,000.00 would be required for interest and amortization. Moreover, the part of the proof relied on by defendant is based upon actual occupancy, rather than the 100% occupancy anticipated by Mr. Cohen, and represented by the defendant to be a fact at the time that the property was sold. For the reasons stated, actual occupancy, for unpredictable reasons, was far less than could have been reasonably anticipated. If straight line depreciation had been used on a 25-year basis, with actual expenses over the period 1952 through 1959, and occupancy had remained at the level existing at the time of its purchase, Arlington would have earned $4,028.00. On the same assumptions, except with the use of a 40-year life, Arlington would

have earned $186,562.00. Again on the same assumptions, had a declining balance method of depreciation been used, Arlington would have experienced a loss during the period of $123,197.00, if a 25-year useful life had been assigned to the buildings. Under the declining balance method, with a 40-year life assigned to the buildings, Arlington would have shown profit of $77,634.00. Thus, based upon an assumed occupancy of 100%, Arlington would have shown a profit on *any* basis other than where the declining balance method of depreciation was used over a 25-year useful life, but, since §§ 23(*l*), 23(n) and 114(a) of the Internal Revenue Code of 1939, and regulations adopted thereunder, give the option to a taxpayer to use a declining balance method of depreciation, a method which vastly increases the likelihood that there would be a loss in early years of acquisition, Briar Homes is not to be penalized for availing itself of this option by the defendant's invocation of § 129 of the Code.

Another exercise in hindsight leads the defendant to argue that it has shown circumstantially that evasion or avoidance of income taxes was Mr. Cohen's real motive. The argument is based upon the fact that savings in expenses of operation of Briar Homes and Warwick Gardens Number Two anticipated by Mr. Cohen, and testified to by him, as one of the reasons why he concluded to bid for the latter, were not realized. The evidence does show that the expenses of operating Briarfield Manor, excluding depreciation, increased in the fiscal year 1953 over fiscal year 1952, and that in fiscal year 1954 they increased over fiscal year 1953. The same is true with respect to expenses of operation, excluding depreciation, for Warwick Gardens Number Two. This proof in and of itself is not conclusive. The mere fact that there was an increase does not establish that there would not have been a greater increase had the two properties not been under the same overall ownership, but perhaps more objectionable is the fact that the defendant's argument would

equate actual experience as a completely reliable indicator of earlier motive.

Actual experience and reasonably predictable future experience may be, and many times are, circumstantial evidence of past motive having great probative value. In this case, however, Mr. Cohen is viewed by the Court as a credible and convincing witness. By his testimony he has shown that tax avoidance or evasion was not his motive. Proof offered by the government, and the arguments constructed thereon, do not demonstrate to the contrary, nor do they sufficiently impugn the probative value of Briar Homes' evidence for the Court to say that Briar Homes failed to meet the burden of proof imposed on it.

Defendant relies heavily on Elko Realty Co. v. Commissioner of Internal Revenue, supra, which, in reliance on § 129, denied a taxpayer the right to offset the losses which it realized in the operation of two F.H.A. apartment projects. A careful reading of the opinion of the Tax Court in that case discloses significant differences between it and the instant case. In Elko Realty, Elko's executive head and person through whom it acted obtained no current information from the seller or F.H.A. as to the overall financial condition of the two apartment properties. Here, Mr. Cohen had current income figures and also figures as to some of the expenses which were furnished by the F.H.A. He was told the level of rents and the percentage of occupancy and, as manager of an almost identical property, he had his own experience and the actual results of that experience on which to rely in projecting expenses. In the Elko Realty case the projects were operating at a substantial loss at the time of their acquisition. There was no proof that this was true in the case at bar; rather, the proof is that losses were sustained primarily as the result of disastrous competition from the owners of Warwick Gardens. In the Elko Realty case the taxpayer's executive head knew that part of the proceeds of settlement went to pay accrued debts of the seller, yet he purportedly

relied on stale income and expense projections of F.H.A. which did not disclose them. No comparable showing has been made in the case at bar. In the Elko Realty case the relationship between acquisition of the apartment projects and the taxpayer's previous business was at best tenuous. In the case at bar, Briar Homes was engaged in its own right in the same business as that which it undertook to pursue through its wholly-owned subsidiary, Arlington. Defendant's reliance on Elko Realty is thus misplaced.

## II

Next to be considered is the question of whether Briar Homes improperly computed depreciation for the tax years in question on Briarfield Manor as a result of an improper determination of the useful life of its buildings, an improper allocation of cost to land, or both.

### A—*Useful Life of Buildings*

Briarfield Manor was completed in 1943, a time when the United States was engaged in World War II, and stringent war-time controls on the use of strategic materials were in effect. The property is of cinder block construction, without basements, and with water paint to cover the walls. It has no insulation. The plumbing system is of cast iron, and none of the apartment units has a bath tub. Originally, heat was provided with a separate coal space heater for each apartment unit, the heater was placed in the living room, and there was a coal bin on the outside. Hot water was provided, with 15-gallon water tanks and side-arm heaters. Overall, the original promoters and builders of Briarfield Manor were allowed to resort to all sorts of exceptional construction specifications because of material shortages. The buildings were originally constructed to provide housing for defense workers, and tenancies were of a temporary resident nature.

When Briarfield Manor was acquired by Briar Homes in 1946, the property was described by an official of the F.H.A. as being in a badly run-down condition, almost on the verge of being a slum. At the trial, other testimony characterized the property as "almost a slum today." When the property was offered for sale by the F.H.A. in 1946, one of the prominent realtors and mortgage brokers of Newport News advised various investors whom he represented not to bid on the property. One of the major considerations that led to this advice was the manner in which Briarfield Manor had been built. As a condition of the 1946 sale, F.H.A. thought it necessary to require, and did require, the purchaser to spend $65,000.00 for repairs and improvements to the property.

Mr. Cohen, an experienced builder in the Norfolk-Newport News area, who had direction of Briar Homes, originally claimed that Briarfield Manor had a useful life of 20 years as of the time of its acquisition by Briar Homes in 1946. However, as a result of a tax audit of the tax returns for fiscal years 1947 and 1948, the engineering and valuation section of the Internal Revenue Service determined the useful life of Briarfield Manor as of that date to be 21 years. This determination was accepted by Briar Homes. It has been reexamined by the Internal Revenue Service on three occasions as part of the review of tax returns for fiscal years 1949, 1950 and 1951, and, until the determination of tax deficiencies which resulted in the present litigation, the Internal Revenue Service consistently accepted a useful life of 21 years as a proper measure.

At the trial, Mr. Cohen testified that, as of 1946, Briarfield Manor had a useful life of 21 years. His testimony was corroborated by that of Mr. Falk, the realtor and mortgage broker who had advised his clients not to bid on the property when it was offered for sale in 1946. Mr. Falk was intimately familiar with the area, and he had made an appraisal of the useful life of the adjoining property—Warwick Gardens Number Two. It was shown, also, that similar projects in the immediate vicinity, including those in the hands of other owners, were being depreciated on a 25-year basis.

The only direct evidence to overcome the testimony offered on behalf of Briar

Homes, and the showing of the position taken by defendant over a period of years, was that of two appraisers employed by defendant for the purposes of this litigation. These appraisers had never seen the properties before October, 1964. They testified that in 1946 Briarfield Manor had a useful life of 30⅓ years. It was shown, also, that at the time that Briar Homes acquired the property in 1946 F.H.A. granted a 30-year mortgage, but a former official of the F.H.A. testified that the term of the mortgage and the interest rate were adjusted so that purchase of the property by a private owner would be economically feasible, F.H.A. would thus relieve itself of the property and would eventually obtain the return of its money.

The two appraisers employed by defendant, Joseph W. Seay and C. L. Hanowell, prepared a joint appraisal report. While both testified, from their testimony it appeared that Mr. Hanowell had far greater command of the facts and matters set forth in the report than his colleague. Mr. Hanowell testified that in making a determination of the original economic life of Briarfield Manor he and Mr. Seay took into consideration the trends of development and growth in the area of Newport News. He further testified he was aware that, because of heavy dependence on ship construction and military activity, the area had certain periods in which the economy slumps and thereafter recovers. When asked on direct examination how he justified a useful life of 30 years for the property in the light of the erratic economic conditions of the area in which the property is located, he gave the answer set forth in the margin, which appears to lay primary stress on outside economic conditions creating a demand for low-cost housing in the area in question.[3] For tax purposes there are other significant factors which must be given weight. 4A Mertens, Law of Federal Income Taxation § 23.50 (1960 rev. ed.); Treas. Reg. 118, § 39.23(1)–2 (1956). In the case of Briarfield Manor, the principal factor would seem to be its type and quality of construction.

■■ By a preponderance of credible evidence, the Court concludes that Briar Homes has met its burden of proving that the useful life of Briarfield Manor as of June 15, 1946, the date of its acquisition by Briar Homes, was 21 years. Missouri Pac. R. R. Co. v. United States, 338 F.2d 668 (Ct.Cl. 1964); Dysart v. United States, 340 F.2d 624 (Ct. Cl. 1965). This conclusion results from weighing the testimony of Messrs. Cohen and Falk against that of the two appraisers. Entitled also to evidentiary consideration is the determination of the engineering and valuation section of the Internal Revenue Service, A. A. Gal-

3. By Mr. Schuldinger:
 Q Mr. Hanowell, with regard to the economic life of Briarfield Manor, you have heard testimony regarding the economic condition, erratic economic conditions of the area from 1940 on. How do you justify the use of a 30 year economic life for the properties?
 A This particular property is rentable to low income families. The mean income in Newport News in the area, not just Newport News itself but Newport News, Warwick and York County, is about $5,700. That's the family income, as disclosed by the Census Bureau reports in '40 and '50 and of the *Sales Management Survey of Buying Power*, which is a periodical put out showing the retail business trends and the populations of every major area in the United States.
 You have a low rental project here.

You have a low income generally in the area. Unfortunately, those people who can only afford to pay from $37.50 a month rent will always be with us, and in this particular area, because of the shipyard and the military bases around the area, wherein the noncommissioned officers or the persons up to a Private and Private First Class and so forth can only afford a very minimum rent, it would appear from the trend of the population growth and income that these properties would always have a rental value, that there would be persons almost always ready and willing to rent them.
 Q Now, Mr. Hanowell, with regard to Warwick No. 2, did you approach the project in the same manner as you did Briarfield Manor?
 A We did.

lagher Warehousing Corp., P–H Tax Ct. Mem. § 65,000 (1965), although the Court recognizes that the defendant is not estopped to reexamine the question of useful life for the years in question as a result of its previous position, or barred from correcting any mistake that it may have made. Easter v. Commissioner of Internal Revenue, 338 F.2d 968, 969–70 (4 Cir. 1964).

*B—Allocation of Value to Land*

To repeat briefly facts previously stated, Briar Homes assigned a value of $50,-000.00 to the land on which Briarfield Manor was constructed. The Appellate Division of the Internal Revenue Service determined that the value of land was $100,000.00. At the trial defendant offered testimony to support its contention that the proper value of the land was $226,000.00. In its brief, defendant asks the Court to find that the land was worth $226,000.00 so that defendant may have a set-off against any tax refund to which the Court may find that Briar Homes is entitled.

The evidentiary support for Briar Homes' claim that the land should be valued at $50,000.00 rests principally in the testimony of Mr. Cohen. He stated he arrived at the valuation on the basis of his experience and familiarity with land values in the area, and he referred to a purchase made in 1952 or 1953 of 52 acres to the rear of Warwick Gardens Number Two and behind Briarfield Manor at a price of $30,000.00. This was, of course, unimproved land, i. e., it did not have utilities, gutters, streets, and sidewalks. Mr. Cohen referred to a number of other comparables, but he could not identify any of them except that he remembered that one had been purchased about 20 miles away from the subject property. He gave some consideration

to tax assessments as an indicator of the ratio of valuation between land and buildings, but it was shown by other testimony that the fixing of tax assessments in Warwick County at the time of Briar Homes' acquisition of Briarfield Manor was a haphazard procedure. Mr. Cohen thought that the Briarfield land, as raw land, was worth $15,000.00, and the improvements, such as utilities, streets, and the like, were worth $35,000.-00. The original tract comprised 43.5 acres. After dedication of streets it was reduced to approximately 32 acres.

Mr. Falk, one of the principals owning Warwick Gardens, and one of the principals who acquired Warwick Gardens Number Two and Arlington after the tax years in question, testified that during the period 1945 through 1952 raw land in the area sold from $200.00 to $300.00 per acre. He referred to a number of sales that he thought were comparable to the subject property, but all were sales of raw land without any basic improvements. In order to make data with reference to unimproved land applicable to improved land, Mr. Falk stated that you must take the cost of raw land and add the cost of streets, curbs, gutters, water, and sewers, less the amount of municipal contribution.[4]

To support the value which it contends should be assigned to the Briarfield Manor land, defendant presented a joint appraisal of Messrs. Hanowell and Seay, previously referred to. They undertook, by the residual cost method, to determine the value of the land. In other words, they undertook to fix the value of the property as an entirety by capitalizing income and then deducting therefrom reproduction cost of the improvements, less depreciation, leaving the residue of value to be assigned to the land. The ratio of

4. There was testimony that the cost of the raw land, adjusted to eliminate the cost of the land dedicated for improvements, was $18,500.00. There was also testimony that streets, curbs, gutters, sewers and water cost approximately $180,000.00. The record is not clear, however, whether the latter figure is the net cost to the owner after deducting the

amount of municipal contribution. The Court's reading of the record leads it to believe that the latter figure is the overall cost without giving effect for diminution for municipal contribution. In either event, the record is inadequate to determine the historical cost of the improved land to the original owner.

value, thus developed, between land and buildings was then applied to the actual sales price of the property to determine the portion thereof attributable to land. By the approach they employed, the appraisers concluded that Briarfield Manor in its entirety was worth $1,475,000.-00, of which $261,044.00 represented the value of the land. The ratio between the two values was then applied to the actual selling price of $1,440,112.00, indicating a value of land in the amount of $226,-238.00.

The Court concludes that Briar Homes did not meet its burden of proof of showing that the land had a value of $50,000.00. The Court also concludes that the evidence does not support the value of $226,000.00 urged by the defendant. The latter conclusion is reached for a number of reasons. First, admittedly, the method of valuation employed by the appraisers is the most unreliable of any method of valuation which may be pursued. Second, the appraisers rejected, both as to Briarfield Manor and Warwick Gardens Number Two, their overall valuation as established by the actual arm's-length transactions which had occurred, and could assign no real reason as to why that data was rejected, other than one which leads the Court to the conclusion that in seeking to determine the price upon which a willing seller and a willing buyer, both acting without compulsion, would agree, the appraisers prefer to shut their eyes to realities and to plumb the depths of the field of theory. On cross examination, the appraisers both freely admitted that a slight change in the rate at which they capitalized net income in order to determine overall value would result in a conclusion that the land had a negative value. The capitalization rate employed by the appraisers was one which leaned heavily on the rate of interest fixed by F.H.A. on its mortgage, and failed to take into account the special considerations grounded in public policy which motivated F.H.A. in granting such a favorable rate. The record contains no evidence of the prevailing rate of return in the community which the Court might capitalize even if the Court found the defendant's method best suited to arrive at a fair value in this case. Moreover, the appraisal was based upon the theory that Briarfield Manor at the time of its completion had a 33-year useful life. The Court has already determined that Briar Homes met its burden of proof in establishing that 25 years was the proper useful life at the time of the completion of the project, with 21 years remaining at the time of its acquisition by Briar Homes. If a 25-year useful life had been used instead of the one employed by the appraisers, land would have been valued at $59,000.00 out of a total of $1,475,000.00, in determining the ratio to be applied to actual selling price and the portion thereof attributable to land.

 The Court concludes that Briar Homes has not met its burden of overcoming the presumptive validity of the Commissioner's allocation of value to land. The Court also concludes that defendant has failed to show " * * * that there is a reasonable basis in fact * * * " for the conclusion that the value of land was greater than that assigned by the Commissioner so as to entitle defendant to a set-off for more taxes on this item. Missouri Pac. R. R. Co. v. United States, supra, 338 F.2d at 671.

### III

It is now necessary to consider whether Briar Homes improperly computed depreciation for the tax years in question on Warwick Gardens Number Two as a result of an improper determination of the useful life of the buildings or an improper allocation of cost to land, or both.

#### A—Useful Life of Buildings

Warwick Gardens Number Two was completed in 1951. Although not built under the same conditions as those under which Briarfield Manor was completed, Warwick Gardens Number Two, like Briarfield Manor, has inherent defects of

construction which adversely affect its physical life. The type of construction is frame, with asbestos roof. There is an air chamber between the exterior and interior walls, and the interior wall is a dry wall. The land on which the buildings are constructed has not been improved by storm drains. It is low-lying and has the general drainage problems of a great deal of land in the Norfolk-Newport News area. Water collects under the buildings comprising Warwick Gardens Number Two and remains until the ground can absorb it. As a result, termite infestation is encouraged and there is a considerable problem with mold and mildew, causing supporting joists and timbers to deteriorate.

Based upon his general experience and the special considerations attaching to Warwick Gardens Number Two, Mr. Cohen determined that a 25-year useful life for purposes of depreciation would be reasonable. In making his determination, he took account of the fact that Warwick Gardens Number Two is a housing project similar to Briarfield Manor, appealing to low-income lessees and with a high turnover.

Mr. Falk, who testified in regard to Briarfield Manor, also testified in regard to Warwick Gardens Number Two, and his testimony corroborated that of Mr. Cohen. Mr. Falk made an appraisal of Warwick Gardens Number Two in 1957 to determine its useful life for depreciation purposes, and it was his conclusion that the useful life of the buildings as of 1951 would be 25 years. Mr. Falk's opinion rested upon his considering and giving effect to the economic background of the community, the type of tenants and constant turnover, the minimal construction of the property, the general area of the property, the lowness of the area, and the problem of dampness under the buildings, with consequent mold, mildew, termites and rot. Mr. Falk also considered the competitive situation between Warwick Gardens Number Two and Warwick Gardens.

Defendant sharply attacks the propriety of Mr. Falk's giving attention to competitive conditions and placing reliance upon inherent physical defects of construction; but these factors seem significant in this case for determining the period during which the property may be utilized effectively and economically for the intended business purposes of the taxpayer. In regard to competition, it is the defendant's contention that availability of low income groups in the area and the existence of employment opportunities available to such groups makes obsolescence irrelevant, because these groups cannot afford better and more modern housing. As was indicated in regard to Briarfield Manor, the Court does not find this argument persuasive. Operating costs may make the venture economically unfeasible for the taxpayer. In regard to defects of construction, defendant argues that an appraiser must assume that the property he is appraising will receive necessary maintenance by the owner. Ordinarily, this is true, but the problems with construction and maintenance faced by the owners of Warwick Gardens Number Two, whoever they may be, are far greater than the ordinary maintenance required to maintain a building in usable condition.

■ Notwithstanding that the two appraisers who appraised Briarfield Manor also appraised Warwick Gardens Number Two, and were of the view that the useful life of the latter for purposes of depreciation was 40 years, the Court concludes that by a preponderance of credible evidence Briar Homes has met its burden of proving that the useful life of Warwick Gardens Number Two as of the date of its acquisition by Arlington was 25 years.

### B—*Allocation of Value to Land*

Arlington assigned a value of $75,-000.00 to the land on which Warwick Gardens Number Two was constructed. The Appellate Division of the Internal Revenue Service determined that the value of land was $135,000.00. At the trial defendant offered testimony to show that the proper value of the land was $189,000.00, but, unlike its position in

regard to Briarfield Manor, defendant in its brief does not seek a set-off for additional taxes due. Rather, it takes the position that " * * * the taxpayer failed to sustain its burden of proving by a preponderance of the evidence what the correct value of the land and improvements of Warwick #2 was on December, 1951."

The testimony offered by Briar Homes to support its allocation of value to land was that of Mr. Cohen. Mr. Cohen's testimony, together with that of Mr. Falk, in regard to the allocation of value to land of Briarfield Manor has been previously described. As was true with respect to Briarfield Manor, their combined testimony lacks persuasive force, such that the Court concludes that Briar Homes failed to meet its burden of proof of showing that the Warwick Gardens Number Two land had a value of $75,000.00.

Notwithstanding that defendant does not ask the Court to find that the land had a value of $189,000.00, but only that the figure advocated by Briar Homes should not be adopted, the Court, for the reasons previously stated, is not impressed by the appraisal of Messrs. Hanowell and Seay. If required to make a finding, the Court would conclude that defendant has failed to show that there is a reasonable basis in fact to support any set-off.

■ Neither Briar Homes nor defendant has overcome the presumptive validity of the Commissioner's determination that the Warwick Gardens Number Two Land was worth $135,000.00.

### IV

There remains only the question of treatment of net proceeds from the operation of Warwick Gardens Number Two in the period August 1, 1951 to December 10, 1951.

Mr. Cohen, as agent for a corporation to be formed, entered into a contract to purchase Warwick Gardens Number Two as of September 7, 1951. By its terms the contract provided for closing on or before October 15, 1951. For reasons having no relevancy to the issue at hand, settlement did not take place until December 10, 1951. By its terms, however, the contract of sale provided that adjustment of interest, taxes, hazard insurance, *operating income and operating expenses* should be as of August 1, 1951 and, further, by ¶ 5, that "The Purchaser [subsequently Arlington] shall receive the benefit of all income from the property and shall bear all expenses of operation of the property * * *."

Contemporaneously with the execution of the contract of sale, Mr. Cohen and F.H.A. entered into a lease made as of September 17, 1951 which provided that Mr. Cohen would lease the premises and pay as rent to F.H.A. " * * * all gross rentals collected by the Tenant * * * less expenses paid by the Tenant hereunder in the operation of the leased premises, which shall * * * include a charge for management costs of not to exceed two and one-half per centum (2½%) of gross rentals collected by the Tenant hereunder from subtenants * * *."

Notwithstanding the terms of the lease, at settlement on December 10, 1951 Arlington retained the excess of receipts over disbursements for the period subsequent to August 1, 1951, in accordance with ¶ 5 of the contract of sale, and also received credit for prepaid rents as of July 31, 1951, in accordance with the contract of sale. Thus, Arlington was allowed the stipulated amount of $43,666.91. Arlington applied this sum on its books in diminution of the overall cost of the project. Defendant contends that this sum was income to Arlington.

■ The Court agrees with the defendant's contention. The documents executed between the parties, and the parties' construction of those documents, as evidenced by the allowances made at settlement, indicate that in the contemplation of the parties, Arlington acquired title to Warwick Gardens Number Two as of August 1, 1951. The net amount of $43,666.91 allowed to Arlington was thus income arising out of its ownership of

Warwick Gardens Number Two, and not simply a return of capital. In its consolidated income tax return for the fiscal year ended May 31, 1952, Briar Homes should have reported $43,666.91 more in income than was actually reported.

In accordance with the stipulation made at the pre-trial conference, and embodied in the pre-trial order, the parties may agree upon the form and amount of judgment to be entered to reflect the views stated herein.