The ZANESVILLE INVESTMENT COM-
PANY, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 15282.

United States Court of Appeals
Sixth Circuit.

Aug. 12, 1964.

Lawrence D. Stanley, Columbus, Ohio
(Joseph S. Platt, John A. Dunkel, Colum-
bus, Ohio, on the brief), for petitioner.

Norman H. Wolfe, Atty., Dept. of Jus-
tice, Washington, D. C. (Louis F. Ober-
dorfer, Asst. Atty. Gen., Lee A. Jack-
son, Harry Baum, Attys., Dept. of Jus-
tice, Washington, D. C., on the brief),
for respondent.

Arthur A. Armstrong, Los Angeles,
Cal., for Amicus Curiae.

Before PHILLIPS, Circuit Judge,
McALLISTER, Senior Circuit Judge,
and LEVIN, District Judge.

**508**

LEVIN, District Judge.

The question presented for decision is whether Section 269 [1] of the Internal Revenue Code of 1954 or some judicially enunciated principle of law prevents the offsetting in a consolidated return of cash operating losses and losses realized on the sale of physical assets sustained after affiliation by one corporate member of an affiliated group with the post-affiliation profits of another corporate member thereof, where it could be anticipated that such operating losses would be incurred.

The cases principally relied on by the Government [2] are not apposite, as they all concern situations where a taxpayer was attempting to utilize built-in tax losses (i. e., losses which had economically accrued prior to the affiliation but which had not as yet been realized in a tax sense), whereas the taxpayer in this case is attempting to offset actual cash losses incurred both economically and taxwise after the affiliation.

Since the Government cites no authority in point and independent research discloses none, it will be necessary to review the history of Section 269 and the consolidated returns provisions to determine whether the interpretation sought by the Commissioner is correct. The facts of this case are as follows:

During the period 1951 through August 31, 1955, a coal mine corporation (Muskingum Coal Company), which in prior years had been highly profitable (almost four million dollars of net income in the period 1945 to 1950), sustained operating losses of about $730,000 in an attempt to develop a new mine opening to replace the prior mine opening which had been exhausted. These losses had been financed in part by loans from the taxpayer and its wholly-owned subsidiary, [3] Earl J. Jones Enterprises, Inc., totaling $320,268.68, during the period from September 1953 to August 1955, of which $42,930.79 was repaid. Enterprises was profitably engaged in operating a newspaper.

In September 1955, Muskingum was in the process of attempting to solve its problems through a new type of mechanization, but encountered continuing difficulty. Muskingum did not have adequate funds either to finance the purchase of such equipment or absorb the operating losses that almost certainly would continue to be sustained before profitable operations might be expected.

At this juncture, on September 1, 1955, Earl J. Jones, the sole stockholder [3] of Muskingum since 1945, transferred all the stock thereof to the taxpayer (of which, since 1948, he was also the sole stockholder).

The Tax Court found (38 T.C. at p. 414) that the principal purpose of the transfer to the taxpayer of the stock of Muskingum (the losing coal mine business) was to utilize Muskingum's "anticipated" losses on a consolidated return to be filed with the other members of the

1. Sec. 269 [1954 Code]. "(a) In General.
 —If——
 "(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
 "(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed.

2. R. P. Collins & Co., Inc. v. United States, 303 F.2d 142 (1st Cir. 1962); Elko Realty Co. v. Commissioner, 29 T. C. 1012, affirmed per curiam, 260 F.2d 949 (3rd Cir. 1958); J. D. & A. B. Spreckels Co. v. Commissioner 41 B.T.A. 370 (1940).

3. Less than one per cent of the stock was held by others.

affiliated group, including the profitable newspaper publisher (Enterprises) and that this was interdicted under the provisions of Section 269 of the Internal Revenue Code of 1954 and the principle enunciated in J. D. & A. B. Spreckels Co., 41 B.T.A. 370 (1940).

The taxpayer, Enterprises, and Muskingum filed consolidated returns for 1955 and 1956. Muskingum sustained an operating loss of $176,806 during the period September 1 to December 31, 1955, and an operating loss of $369,950 during the period January 1 to July 10, 1956. In July 1956 Muskingum sold its mine properties at a net loss of about $480,000 and later filed a petition in bankruptcy. Enterprises' taxable income in 1955 was $175,283.61 and during the first seven months of 1956 was $102,496.46. Enterprises operated profitably also in subsequent periods.

Both prior and subsequent to affiliation, Muskingum's operations were extensive, its sales were at an annual rate in excess of two million dollars, and it employed several hundred persons throughout the period in question. Muskingum attempted to sell its properties between October 1955 and June 1956, and various transactions were discussed, negotiated, and, in two cases, documented; but none was consummated. Had any been consummated, Muskingum's properties would have been disposed of at a tax gain rather than a loss.

It is not disputed that Muskingum and the other members of the affiliated group that were financing it were engaged in a good faith but unsuccessful attempt to overcome the engineering problems and thereby render operations at the second mine opening economically profitable. In this connection, the taxpayer and Enter-

prises made further advances of $161,-359.28 to Muskingum in the post-affiliation period, of which $44,966.59 was repaid. The total investment in physical assets, in an attempt to bring in the second mine opening, was $1,026,610.30, of which $247,309.01 was spent in the post-affiliation period. It would thus appear that approximately $247,000 of the $480,-000 net loss realized on the sale of Muskingum's properties was paid for in cash after affiliation. The Government has not contended that such loss was incurred in an economic sense prior to affiliation.

Section 129 of the Internal Revenue Code of 1939, now Section 269 of the I. R. C. of 1954, was added in early 1944 to prevent the distortion through tax avoidance of the deduction, credit, and allowance provisions of the Code and, particularly, the then recently developed practice of corporations with large incomes acquiring corporations with built-in losses, credits, or allowances (Senate Finance Committee Report No. 627, 78th Cong., 1st Sess., accompanying Revenue Act of 1943, reprinted at 1944 Cumulative Bulletin 1016). Most of the cases that have arisen under Section 269 and its predecessor, Section 129, have dealt with the sale by one control group to another of a corporation with, typically, a net-operating loss carryover, and the efforts of the new control group to utilize this carryover by funneling otherwise taxable income to a point of alleged confluence with the carryover.[4]

Until this case, the Commissioner made no attempt in the approximately twenty years since enactment of Section 129 (now Section 269), so far as the reported cases indicate, to deny a taxpayer the right to offset an out-of-pocket dollar loss incurred after affiliation with post-affilia-

---

4. In each of the following cases cited by the Government, there was a change in the stockholding group after the occurrence of the operating losses and before the income sought to be offset against the same was earned. Mill Ridge Coal Company v. Patterson, 264 F.2d 713 (5th Cir. 1959); Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., 278 F.2d 392 (9th Cir. 1960);

Urban Redevelopment Corporation v. Commissioner of Internal Revenue, 294 F.2d 328 (4th Cir. 1961); J. G. Dudley Co. v. Commissioner of Internal Revenue, 298 F.2d 750 (4th Cir. 1962); Brown Dynalube Company, Inc. v. Commissioner of Internal Revenue, 297 F.2d 915 (4th Cir. 1962); Thomas E. Snyder Sons Co. v. Commissioner of Internal Revenue, 288 F.2d 36 (7th Cir. 1961).

**510**

tion income.[5] We do not believe that Section 269 requires such a result.

An examination of the Senate Finance Committee report accompanying the Revenue Act of 1943, which enacted Section 129 of the I. R. C. of 1939, reveals that the statutory language cannot be mechanically interpreted and that all acquisitions that result in tax saving are not prohibited. The test, according to the Senate Finance Committee, is:

> "* * * whether the transaction or a particular factor thereof 'distorts the liability of the particular taxpayer' when the 'essential nature' of the transaction or factor is examined in the light of the *legislative plan*' which the deduction or credit is intended to effectuate." 1944 Cum. Bull., p. 1017. (Emphasis added.)

This legislative explanation found its way into the Treasury Regulation, which reads as follows:

> "Characteristic of such circumstances are those in which the effect of the deduction, credit, or other allowance would be to distort the liability of the particular taxpayer when the essential nature of the transaction or situation is examined in the light of the basic purpose or *plan* which the deduction, credit, or other allowance was designed by the Congress to effectuate." Internal Revenue Regulation 1.269–2(b). (Emphasis added.)

In deciding whether the essential nature of the transaction before this court violates the "legislative plan," the fact that the Tax Court's decision is the first[5] in the heavily litigated tax field where a court was asked to deny a taxpayer the

right to use real post-affiliation losses, incurred and paid in cash after affiliation, against post-affiliation income suggests that the legislative plan may not be violated by allowing the deduction.

Individuals, partnerships, and corporations have long been permitted to offset the losses incurred in one business of the taxpayer against profits realized by another business of the same taxpayer. Thus, there is no "legislative plan" that prohibits such offsetting.[6] In fact, the Internal Revenue Code permits an individual, partnership, or corporate taxpayer to do just that.

But here, the loss was incurred by one entity, and the profit was realized by another. What is the legislative plan in this regard?

Congress first required [7] and now permits [8] certain affiliated corporations to file consolidated returns and to offset the losses of one against the profits of another. The consolidated return regulations forbid the use of pre-affiliation losses of one entity against pre- or post-affiliation consolidated income (Reg. 1.-1502–31(b) (3)) but have never suggested that post-affiliation losses may not be utilized against post-affiliation consolidated income. In fact, these regulations specifically permit the use of post-affiliation losses against post-affiliation consolidated income. (Reg. 1.1502–31(b)).

All the cases cited by the Government where consolidation was denied involved situations where the taxpayer sought to take advantage of the realization after affiliation of losses which in an economic sense had occurred prior to the affiliation. In J. D. & A. B. Spreckels Company, 41

---

5. In R. P. Collins & Co., Inc. supra, discussed later in this opinion, the out-of-pocket dollar loss incurred after affiliation was not allowed because a majority of the court felt that it was tainted—being in respect to the built-in loss, the obtaining of which was the primary purpose of the acquisition, and hence within the proscription of Section 269. For a similar holding by the Tax Court, see Temple Square Manufacturing Co., 36 T.C. 88, 95 (1961).

6. In this connection, see Revenue Ruling 63–40, 1963–1 Cum.Bull. 46, discussed later in this opinion.

7. Internal Revenue Regulations 41, Article 77; Sec. 1331 of the Internal Revenue Act of 1921; Sec. 240 of the Internal Revenue Act of 1918.

8. Section 240 of the Internal Revenue Act of 1921; Sec. 1501 et seq. of the 1954 I.R.C.

B.T.A. 370 (1940), after the loss corporation had contracted to sell its remaining asset at a tax loss of $192,000, its sole stockholder transferred all its capital stock to the taxpayer there before the court. The sale was consummated, and the economic loss of $192,000 incurred prior to the affiliation was realized in a tax sense. The Tax Court (then the Board of Tax Appeals) refused to permit such loss (which, to repeat, had accrued prior to the affiliation) to be utilized against the income of other members of the new affiliated group.[9]

In Elko Realty Company, 29 T.C. 1012 (1958), affirmed in Elko Realty Company v. Commissioner, 260 F.2d 949 (3rd Cir. 1958), the taxpayer corporation acquired for a nominal consideration the stock of two separate corporations each owning apartment houses which were subject to FHA insured mortgages in excess of their cost, and an attempt was made to utilize the large depreciation losses against consolidated income. It was found that there was no intent that the apartment house corporations could ever be made to operate profitably. There was no showing that the value of the apartment houses at the time of the acquisition equalled the bases for depreciation.[10] Compare Regulation 1.1502–31(b) excluding in the determination of the consolidated income deductions with respect to the sale or exchange of capital assets to the extent that such deductions are attributable to events preceding the affiliation.[11]

R. P. Collins & Co., Inc. v. United States, 303 F.2d 142 (1st Cir. 1962), was concerned with an acquisition by one control group from another of stock of a corporation owning property with a built-in tax loss. A deduction for the tax loss was claimed on the subsequent sale of the property and realization of the economic loss incurred prior to affiliation. Post-affiliation operating losses were also suffered and a majority of the court thought that their utilization should also be denied because once it was determined that the acquisition was within the coverage of Section 269 all losses, including post-affiliation economic losses, must be denied. The dissenting judge would have allowed the post-affiliation operating loss. Collins, however, is not authority for the proposition here advanced by the Government because even the majority would not have disallowed the post-affiliation operating loss if it stood by itself, as it does in this case, and only denied the post-affiliation operating loss because it was thought to be tainted as in respect to the built-in loss the use of which, as we have seen, Section 269 was designed to prevent. The fact that the dissenting judge in Collins would have allowed the post-affiliation operating loss and the two majority judges denied it only because it was tainted ("They are tarred by the same brush," 303 F.2d at p. 146), as incidental to the built-in loss, tends to support the taxpayer's view that post-affiliation operating losses standing by themselves are not within the coverage of Section 269.

9. The Supreme Court's decision in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), like Spreckels, concerned a situation where the losses were incurred prior to affiliation.

10. The FHA first mortgages against the apartment house corporations were in default at the time of the affiliation and the net operating income was never adequate to meet the debt service requirements; and the mortgages were subsequently foreclosed.

11. The two other cases cited by the Government where consolidation was denied are also inapposite. In American Pipe & Steel Corp. v. Commissioner of Internal Revenue, 243 F.2d 125 (9th Cir. 1957), and David's Specialty Shops, Inc. v. Johnson, 131 F.Supp. 458 (D.C.S.D.N.Y.1955), the taxpayers sought unsuccessfully to consolidate their taxable income with built-in losses realized by the acquired corporations on sales after the acquisition. In David's Specialty, the sale was arranged (as in Spreckels) before the acquisition, and occurred seven days thereafter. In American Pipe, vacant lots were sold shortly after acquisition at a tax loss of approximately $400,000.

 An individual or corporate member of a partnership is entitled to offset the losses of the partnership (except to the extent they exceed the basis of the member's interest in the partnership) against income derived by such member from other sources, including from other partnerships. (Sections 702 and 704(d) of the Internal Revenue Code of 1954). An individual stockholder of a tax option (Sub-Chapter S) corporation is permitted, to the extent of his investment, to utilize the losses of such a corporation against other income. (Section 1374 of the Internal Revenue Code of 1954).

Similarly, had Earl Jones dissolved all three corporations he could have utilized the Muskingum losses against the publishing company's profits; or if he had dissolved Muskingum and contributed its property to the taxpayer or to Enterprises he could have accomplished a similar result.

In Revenue Ruling 63–40, 1963–1 Cum. Bull. 46, the Internal Revenue Service stated its view that where there is no change in the control group, Section 269 was not applicable to the addition of a new profitable business to a loss corporation, which had discontinued the money losing business, even if the means by which this was accomplished was the purchase by the loss corporation of the stock of the money-making business and the transfer of its assets in liquidation to its new stockholder. Compare Kolker Brothers, Inc., 35 T.C. 299 (1960).

Section 382 of the Internal Revenue Code of 1954 expressly permits the use of historical losses against the income of other businesses where either there has not been a change in the control group (as defined therein) or there has not been a substantial change in the trade or business conducted before the change in control.[12] One would think that if the same control group could, after the loss, add

new income (Revenue Ruling 63–40, supra), there would be no objection to the offsetting of a future loss against future income. The latter case, which is the case before this court, would appear to be a stronger one for the taxpayer.

Although the Government is correct in stating that the transaction must be viewed in the light of what was done, rather than on the basis of what might have been done, one is left with the definite impression that there is no legislative plan to deny the utilization of post-affiliation losses against post-affiliation income and one suspects that one of the basic reasons why taxpayers consolidated corporations and paid the two per cent penalty that prior to the enactment of the Revenue Act of 1964 was payable on consolidated taxable income, was to be able to offset the losses of one corporation against the profits of another. Inherent in the concept of consolidation is the offsetting of loss against income.

The legislative plan is perhaps best revealed by the following excerpts from the Senate Finance Committee report accompanying the Revenue Act of 1928:

"The permission to file consolidated returns by affiliated corporations merely recognizes the business entity as distinguished from the legal corporate entity of the business enterprise. Unless the affiliated group as a whole in the conduct of its business enterprise shows net profits, the individuals conducting the business have realized no gain. The failure to recognize the entire business enterprise means drawing technical legal distinctions, as contrasted with the recognition of actual facts. The mere fact that by legal fiction several corporations owned by the same stockholders are separate entities should not obscure the fact that they are in reality one and the same business owned by the same individuals

12. Compare Commissioner of Internal Revenue v. Goodwyn Crockery Company, 315 F.2d 110 (6th Cir. 1963), where this court held that the net operating losses could be utilized against future income

even though there was a change in the control group because it was found that there was no substantial change in the trade or business conducted.

and operated as a unit. To refuse to recognize this situation and to require for tax purposes the breaking up of a single business into its constituent parts is just as unreasonable as to require a single corporation to report separately for tax purposes the gains from its sales department, from its manufacturing activities, from its investments, and from each and every one of its agencies. It would be just as unreasonable to demand that an individual engaged in two or more businesses treat each business separately for tax purposes.

\* \* \* \* \* \*

"Your committee believes firmly that the privilege of filing consolidated returns is sound in principle and, safeguarded by the regulations to be prescribed, should be granted." S.Report No. 960, 70th Cong., 1st Sess., pp. 13–15, reprinted in Seidman's Legislative History of Federal Income Tax Laws, 1938–1961, at pp. 539–540.

The Regulations promulgated pursuant to such authority have, as appears above, only prohibited the association of pre-affiliation losses with pre- or post-affiliation consolidated income; and have never prevented the offsetting of post-affiliation consolidated income with post-affiliation losses. The legislative plan has clearly been to encourage the filing of consolidated returns:

"While the committee is convinced that the consolidated return tends to conserve, not to reduce the revenue, the committee recommends its adoption not primarily because it operates to prevent evasion of taxes or because of its effect upon the revenue, but because the principle of taxing as a business unit what in reality is a business unit is sound and equitable and convenient both to the taxpayer and to the Government." Re-

port of the Senate Finance Committee, 65th Cong., 3rd Sess., Senate Report No. 617, pp. 8 and 9, accompanying the Revenue Act of 1918, reprinted in Seidman's Legislative History of Federal Income Tax Laws, 1938–1961, at p. 933.

This legislative attitude also finds expression in the House and Senate reports accompanying the Revenue Act of 1964, both of which contain the following statement:

"General reasons for provision.— The bill removes the special 2-percent penalty tax on the privilege of filing a consolidated return, in part because the return of commonly controlled corporations as a single economic unit for tax purposes is in accord with the reality of the situation. Moreover, there appears to be no reason why, where a group of commonly controlled corporations are willing to have their operations consolidated for tax purposes, the mere presence of more than one corporate organization in the group should result in any penalty tax. No such penalty, for example, is exacted in the case of other corporate organizations operating through divisions rather than separate corporations." [13]

We have seen that the principal purpose of Section 269 was to deny those losses, credits, deductions, etc., which could only be obtained by acquiring (generally, by buying) a corporation which, because of its own history, had obtained such benefits and which benefits the acquiring person could not otherwise obtain.

The regulations and the courts included within the scope of Section 269 the organization of a corporation as an "acquisition," on the ground that the stockholders are the underlying persons ob-

13. 88th Cong., 2nd Sess., House Report No. 749, and Senate Report No. 830; reprinted in U.S.Code Congressional and Administrative News, issue of February 29, 1964, pages A–115 and A–512. The language in the House Report begins: "Your committee's bill removes \* \* \*" while the Senate Report begins as above set forth. They are otherwise identical to the extent quoted.

taining the benefit. Regulation 1.269–3 (b) (2). James Realty Company v. United States, 280 F.2d 394 (8th Cir. 1960); Coastal Oil Storage Co. v. Commissioner of Internal Revenue, 242 F.2d 396 (4th Cir. 1957).

It is noteworthy that the cases construing Section 269 to date have all involved situations where the loss sought to be utilized flowed from the corporation's individual past history or from the fact that the corporate rather than some other form of business organization was involved and was otherwise unobtainable under any other provision of the Code. But, as we have seen, that is not the case here, as Muskingum's losses could have been realized and offset against other income if the several businesses had been conducted in non-corporate forms or if Muskingum's assets had been dissolved into the taxpayer.

In this case, it may well be, as the Tax Court found, that the taxpayer desired to offset anticipated losses against income; but there is no evidence that such objective is violative of the legislative plan which permits just that in an effort to counter-balance profits with losses. The over-all purpose of Section 269 was to prevent distortion of a taxpayer's income resulting from the utilization of *someone else's loss* or a *built-in but unrealized loss* or, as found by the court in Coastal Oil Storage Co. v. Commissioner of Internal Revenue, supra, through the utilization of the corporate veil to acquire a benefit (the multiplying of surtax exemptions through the organization of so-called "multiple corporations") which otherwise was unobtainable; but there is no indication that Section 269 was designed to prohibit the utilization of future losses against future income merely because a corporate rather than a partnership or individual

proprietorship *form of business enterprise* was involved. We believe that it would be a distortion to deny the utilization of these losses which were incurred in good faith to save a business and that Section 269 does not require any such result.

In a recent decision, Naeter Brothers Publishing Co., 42 T.C. 1, decided April 2, 1964, the Tax Court, in an almost identical fact situation held that consolidation would be permitted. The following appears in the court's opinion:

"We think the anticipated consequences were Missourian's continued operating losses for a short time to be followed by profitable operation. It can hardly be said this was not realistic for it is exactly what did happen."

Actually, the portion of the business that caused the losses in the cited case never did become profitable. " * * * Missourian, apparently despairing of any profitable operations in the printing division, sold the * * * " same. The portion of the loss corporation's business that was profitable after said disposition was profitable before it. In any event, there is no basis for reaching different results based on whether the hoped-for ultimate profitable operation is in fact realized. Hindsight is always better than foresight, but should not be elevated to a standard for determining those consolidations that will be permitted and those that will be denied.

In view of this court's decision, it is unnecessary to consider taxpayer's alternative arguments that there was no acquisition because Earl J. Jones (the underlying controlling person) owned the stock of Muskingum many years before the prohibited purpose could come to mind,[14] or that a loss deduction should be allowed alternatively at least to the

14. The taxpayer relies on the dictum in Thomas E. Snyder Sons v. Commissioner of Internal Revenue, 288 F.2d 36 (7th Cir. 1961), that if the individual there concerned had (as did Earl J. Jones) acquired the stock in the loss corporation prior to the earliest date that

he could have had any purpose to evade or avoid taxes, the Tax Court's decision in Snyder "could not stand." The Government contends on the other hand, that even though the same individual owns the stock of both corporations (taxpayer and Muskingum in this case) an acquisi-

extent of the loss realized on the sale of the physical assets in July 1956; the Government does not contend that this is a built-in loss (Regulation 1.1502–31(b)(9)). Likewise, taxpayer's alternative theory seeking the allowance of bad debt deductions under Section 166(a)(1) need not be reached.

This case is remanded to the Tax Court for the entry of a judgment not inconsistent with this opinion.

Reversed.

tion can occur because the transfer is "farther down" rather than "nearer," citing a statement in the Senate Finance Committee report appearing at 1944 Cum.Bull. p. 1018; and the taxpayer relies on another statement appearing in the Conference Report (House of Representatives report No. 1079, 78th Cong., 2nd Sess.) at 1944 Cum.Bull. p. 1069–70, and on the statements in cases such as

Coastal Oil Storage Company v. Commissioner of Internal Revenue, 242 F.2d 396 (4th Cir. 1957), and Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., 278 F.2d 392 (9th Cir. 1960), that emphasize the individual taxpayer as the underlying person who obtains the benefit that would not otherwise be enjoyed. (See Section 269(a) of the Internal Revenue Code of 1954).