**BRUMLEY–DONALDSON COMPANY,**
Appellant,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.**

No. 25143.

United States Court of Appeals,
Ninth Circuit.

May 12, 1971.

Trask, Circuit Judge, dissented and filed opinion.

**502**

Earl C. Crouter (argued), Los Angeles, Cal., for appellant.

Leonard J. Henzke, Jr. (argued), Meyer Rothwacks, Lee A. Jackson, Attys., Johnnie M. Walters. Asst. Atty. Gen., Tax Div., K. Martin Worthy, Chief Counsel, IRS, Washington, D.C., for appellee.

Before BARNES, DUNIWAY and TRASK, Circuit Judges.

BARNES, Circuit Judge:

Taxpayer, Brumley-Donaldson Co., seeks review of the decision of the Tax Court (T.C. Memo. 1969–183) upholding the Commissioner's assessment of $4,172.36 tax deficiency for the taxpayer's taxable year ended June 30, 1960. Jurisdiction of this Court is based on Sections 7482 and 7483 of the Internal Revenue Code of 1954.

Both parties agree that the basic facts of this case are essentially as found by the Tax Court. Summarized briefly, they are as follows. Taxpayer was organized in September, 1964, to engage in the business, in and about Los Angeles, California, of manufacturing, importing and distributing industrial materials, including the selling of firebricks of various grades. Taxpayer's business was located adjacent to the St. Louis Firebrick & Insulation Company (hereinafter St. Louis) which manufactured second-quality firebricks. Until the date that taxpayer acquired the stock of St. Louis, taxpayer had not manufactured firebricks of any grade but had always purchased its supply of first-quality bricks from North American Refractories of Missouri, and second-quality bricks from St. Louis.

The demand for second-quality bricks steadily declined beginning in the late 1920's and only St. Louis and one other company were supplying the Los Angeles market by 1959. By September 1960, second-quality firebricks were considered as only a complementary item to round out the inventory of a general foundry supply business.

Under this market condition St. Louis began incurring net operating losses in 1952 and by December 23, 1959 (the date of acquisition) had an accumulated net operating loss of $59,547.03. Gross sales of the operation continued to decline subsequent to acquisition.

At the time of acquisition, St. Louis' sole shareholder was Alois J. Mesmer, who individually owned the land which St. Louis occupied. All fixed assets which St. Louis owned had been fully depreciated, except for $543, and as of October 31, 1959, there was a retained earnings deficit of $111,503.

In July or August of 1959, at the request of Mesmer, the officers of taxpayer conferred with auditors of St. Louis. At that time they learned of the existing operating losses. After negotiation, it was agreed that Mesmer would exchange all of the outstanding St. Louis stock for 6,577 shares of taxpayer's stock, and that Mesmer would become assistant to the President of taxpayer at the salary of $1,000 per month. The exchange was accomplished on December 23, 1959. On December 28, 1959 (two business days later) taxpayer liquidated St. Louis and took over all assets and assumed all liabilities of St. Louis.

The issue before the Tax Court was whether taxpayer was entitled to carry over net operating losses of St. Louis or was precluded from doing so by Section 269 of the Code which prohibits the use of net operating loss carry forwards from acquired businesses if the principal purpose of the acquisition was to avoid Federal income taxes.[1]

■ The Tax Court determined that the evidence supported the conclusion that tax avoidance exceeded in importance any other purpose which taxpayer had in acquiring St. Louis.[2] Taxpayer in this appeal contends that this finding was clearly erroneous,[3] in that the Tax Court ignored undisputed evidence which established that taxpayer had sound business reasons for acquiring St. Louis.

Taxpayer's position is without merit. The Tax Court, in its opinion, specifically stated that the steady decline in demand for second-quality firebrick (St. Louis' sole product), the similarly steady decline in St. Louis' profitability and sales, and the awareness of the accumulated net operating losses obtained by officers of taxpayer in meeting with St. Louis' auditors, all supported the conclusion that tax avoidance was the principal reason for acquisition.

Going to the heart of taxpayer's contentions on appeal, the Tax Court did not ignore the evidence which taxpayer argues supports a contrary decision. Taxpayer advanced three business purposes which it argued were the real reasons for acquisition. The evidence which taxpayer now argues was ignored by the Tax Court was related to those three reasons. The Tax Court in its opinion meticulously examined each of these three reasons, and at times referred directly to the evidence offered in support thereof.

1. Internal Revenue Code of 1954 (26 U.S.C.): "*Sec. 269. Acquisitions Made to Evade or Avoid Income Tax.*
   (a) *In general.*—If—
   (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
   (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,
   and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."

2. S.Rept.No.627, 78th Cong., 1st Sess. (1943), 1944 C.B. 973, 1017.
   "The House bill made section 129 operative if one of the principal purposes was tax avoidance. Your committee believes that the section should be operative only if the evasion or avoidance purpose outranks, or exceeds in importance, any other one purpose."

3. It is well settled that the Tax Court's determination of the principal purpose for acquisition is a factual matter which this Court cannot disturb unless the determination is clearly erroneous. Kessmar Construction Co. v. C.I.R., 336 F.2d 865 (9th Cir. 1964).

■ The first reason, that acquisition of St. Louis could increase its overall foundry business, the Tax Court did not believe. It noted that a study in April, 1960 (the Doolittle report, made *after* the acquisition), had been made by taxpayer's employees with respect to increasing sales of second-quality firebricks and that the study had recommended construction of a new kiln and renovation of old equipment. But no action was taken thereon. Aside from this study, no evidence was presented to show in what manner the purchase would or could increase overall foundry business. The Tax Court concluded that this was not a purpose for acquisition and we find that conclusion was not clearly erroneous.

■ The second reason relied on by the taxpayer, which it argues was ignored or misconstrued by the Tax Court, indicated that the adjacent land was needed by taxpayer for the purpose of expansion and that this was the reason for acquisition. But the Tax Court found as a fact that the adjacent land was owned by Mr. Mesmer individually and concluded that the alleged purpose in acquiring the corporation was inconsistent with the fact of Mesmer's ownership of the land. No evidence was introduced to show that Mesmer was unwilling to sell his land absent acquisition of St. Louis by taxpayer. Therefore, the Tax Court's rejection of this purpose was not erroneous.

■ Finally, taxpayer urged that the purpose of acquisition was to obtain the services of Mesmer. However, the Tax Court stated that in light of Mesmer's lack of success with St. Louis, it did not give much weight to the alleged purpose. Again, the judgment of the Tax Court in this respect was not clearly erroneous.

Because none of the three purposes for acquisition was persuasive to the Tax Court, it found that taxpayer had failed to carry the burden of proving that tax avoidance was not the primary purpose for acquisition.[4] We agree.

■ Taxpayer emphasizes the proposition that facts supporting the three business purposes advanced were *stipulated* by both parties. The Commissioner is quite right in his response to this argument. The stipulation in this case went to the authenticity of the documents stipulated,[5] not to the truth of the matters stated therein. Consequently, the documents constituted some evidence which the Tax Court was required to consider (which we have determined it did), in reaching its conclusion. But it was not bound by the statements

4. Taxpayer entered this suit faced with a presumption that tax avoidance was the principal purpose for acquisition. That presumption disappeared upon presentation of some evidence to the contrary. Nevertheless, taxpayer still faced the burden of proving by at least a preponderance of the evidence that tax avoidance was not the principal purpose for acquisition. American Pipe & Steel Corp. v. C.I.R., 243 F.2d 125 (9th Cir. 1957); Thomas E. Snyder Sons Co. v. Comm. of Internal Revenue, 288 F.2d 36, 38 (7th Cir. 1961); J. T. Slocomb Company v. C.I.R., 334 F.2d 269 (2nd Cir. 1964).

5. Taxpayer's reliance upon Hawaiian Trust Co., Ltd. v. United States, 291 F.2d 761 (9th Cir. 1961) is misplaced. The Court in that case stated that

"[t]he parties have stipulated that at the time of the acquisition of the stock on October 6, 1950, 'no consideration was given by Refiners to the tax aspects of the transaction.'" (p. 766) Such a stipulation went to the very substance of the controlling fact and could not be ignored to reach a contrary conclusion. But the stipulations in this case were not decisive on the controlling fact. Paragraph 32 of the stipulation of facts (Rec. 26–27) states:

"In paragraphs 13, 14, 15, 19, 20, 21, 22, 25 and 29 hereof, the parties have stipulated to the authenticity of the documents referred to in said paragraphs; however, in no way has the respondent stipulated to the basis of the opinions expressed in such documents or to the truth of the matters contained in them. Additionally, in paragraphs 10, 11, 13, 14, 15, 19 and 20, inclusive, the respondent is stipulating only to the form of said transactions and by so stipulating does not agree that the form constituted the substance of said transactions."

contained therein. In the same vein, the Tax Court did not draw inferences contrary to any uncontradicted evidence when it viewed the factors of decreasing demand, declining sales, and awareness of a net operating loss as support for the presumption of a tax avoidance purpose. The fact that there was no direct testimony contradicting evidence which the Tax Court could reasonably conclude was inherently improbable, unconvincing, and which was given by uncorroborated, interested witnesses does not prevent the Tax Court from drawing the inferences which it did. Furthermore, the legislative statement cited by taxpayer[6] does not support reversal. Our review of the Tax Court's findings of fact and opinion indicates that the Tax Court did scrutinize the entire transaction and course of conduct surrounding the circumstances of acquisition. For the reasons we have stated, we affirm.

The Commissioner argues alternatively, as he did below, that if this Court determines that the principal purpose for acquisition was not tax avoidance, part of the net operating loss carry forward must be disallowed under Section 382(b)(2). The Tax Court pinned its decision on Section 269 which disallows the entire carry forward and declined to discuss the Section 382(b)(2) issue. In view of the disposition of this appeal based on Section 269, and because the Tax Court gave no opinion on the Section 382(b)(2) issue, this Court likewise refrains from reaching that issue.

Affirmed.

TRASK, Circuit Judge (dissenting):

I disagree. The sole issue before the Tax Court was whether the taxpayer (Brumley-Donaldson) was prevented from carrying over previously incurred net operating losses of the acquired corporation (St. Louis) because the "principal purpose" of the acquisition was the avoidance of Federal income taxes. Int. Rev.Code of 1954, § 269(a). Taxpayer entered the proceeding in the Tax Court faced with the presumption that the Commissioner's administrative determination, that tax avoidance was the principal purpose, was correct. However, upon the introduction of evidence by the taxpayers, provided that the evidence thus introduced was sufficient to support a contrary finding, the presumption of correctness disappeared. Potts, Davis & Company v. C. I. R., 431 F.2d 1222, 1225 (9th Cir. 1970); American Pipe & Steel Corp. v. C. I. R., 243 F.2d 125, 126–127 (9th Cir. 1957), cert. denied, 355 U.S. 906, 78 S.Ct. 333, 2 L.Ed.2d 261 (1957). The majority agrees that the presumption did, in fact, disappear. Nevertheless, taxpayer still had the burden of proving to the Tax Court by a preponderance of the evidence that the Commissioner's determination was erroneous, i. e. that tax avoidance was not the principal purpose for acquiring St. Louis. See Majority's opinion, footnote 4. The Tax Court found that taxpayer did not meet his burden.

The sole issue before this court then is whether the Tax Court's determination that the evidence supported the conclusion that tax avoidance exceeded in importance any other purpose which taxpayer had in acquiring St. Louis (i. e., taxpayer failed to meet his burden) was clearly erroneous. The Tax Court's determination is clearly erroneous if, on reviewing the entire record, this court is left with a definite and firm conviction that a mistake has been committed. Kessmar Construction Co. v. C. I. R., 336 F.2d 865, 867 (9 Cir. 1964). I believe that it has.

---

6. S.Rept.No.627, 78th Cong., 1st Sess. (1943), 1944 C.B. 973, 1017.

"The House bill made section 129 dependent upon the purpose for which the acquisition was made or availed of. Your committee eliminated "availed of" from the requirement. *The determination of the purpose for which the acquisition was made necessarily requires a scrutiny of the entire transaction, or course of conduct, with all its surrounding circumstances.*" [Emphasis added.]

### 1. *The Legislative History*

The legislative history of § 269(a) and its predecessor, § 129(a) of the Int. Rev.Code of 1939, gives us some insight into the evil to be proscribed. The evident congressional purpose in enacting section 129(a) of the 1939 Code "was to prevent the 'practice of corporations with large excess profits * * * acquiring corporations with current, past, or prospective losses or deductions * * * for the purpose of reducing income and excess profits taxes.' S.Rep. No. 627, 78th Cong., 1st Sess., at 58 (1944)." Peter Pan Seafoods, Inc. v. United States, 417 F.2d 670, 674 (9th Cir. 1969).

The House Report on section 129(a) was worded in this vein:

"This section is designed to put an end promptly to any market for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability." [1]

However, as pointed out in Zanesville Investment Co. v. C. I. R., 335 F.2d 507, 510 (6th Cir. 1964), the legislative history does indicate a rather general analytical guideline to be used in interpreting § 129.

"An examination of the Senate Finance Committee report accompanying the Revenue Act of 1943, which enacted Section 129 of the I.R.C. of 1939, reveals that the statutory language cannot be mechanically interpreted and that *all acquisitions that result in tax saving are not prohibited.* The test, according to the Senate Finance Committee, is:

' * * * whether the transaction or a particular factor thereof "distorts the liability of the particular taxpayer" when the essential nature of the transaction or factor is examined in the light of the *"legislative plan"* which the deduction or credit is intended to effectuate.' 1944 Cum.Bull., p. 1017." (Emphasis added).

Treas.Reg. § 1.269–2(b) (1962) states in part:

"The distortion may be evidenced, for example, by the fact that the transaction was not undertaken for reasons germane to the conduct of the business of the taxpayer, by the unreal nature of the transaction such as its sham character, or by the unreal or unreasonable relation which the deduction, credit, or other allowance bears to the transaction."

Here there was no finding by the Tax Court that there was any such distortion of the liability of the taxpayer. Neither was there any contention made by the government in its brief or upon oral argument that there was any such distortion. It simply did not exist. Moreover, as I shall point out hereafter, the evidence clearly discloses that the transaction was in fact undertaken for reasons germane to the conduct of the business of the taxpayer. The two businesses handled products which complemented each other. One acquired the other in order to package both products into a single offering. There was no proof of artifice or sham.

The legislative history pertaining to the enactment of the present statute, section 269 of the 1954 Code, concerns itself entirely with subsection (c), a provision not contained in the 1939 Code. Subsection (c) provides that there is *prima facie* evidence of a principal purpose of tax avoidance in cases where the adjusted basis of the property acquired, together with the value of tax benefits not otherwise available except by virtue of the acquisition, such as operating loss carryovers, is substantially greater than the amount paid for the property. Addition of subsection (c) was believed to strengthen the enforcement problems experienced under the previous version of the section resulting from difficulties in determining whether there was a tax

---

1. H.R.No.871, 78th Congress, First Session (1944 Cum.Bull. 901, 938). Cf. C.I.R. v. British Motor Car Distributors, Inc., 278 F.2d 392, 394 n. 3 (9th Cir. 1960).

avoidance purpose. H.Rep. No. 1337, 83d Cong., 1st Sess., at 32 and A66–67, 1954 U.S.Code Cong. & Admin.News, at pp. 4057, 4203–4204; S.Rep. No. 1622, 83d Cong., 1st Sess., at 39–40, 228, 1954 U.S.Code Cong. & Admin.News at pp. 4670, 4864–4865; H.Rep. 2543 (Conf.), 83d Cong., 1st Sess., at 32–33, 1954 U.S. Code Cong. & Admin.News, at p. 5292.

There was again no finding of fact by the Tax Court that such a *prima facie* showing had been made, nor was any claim to that effect made by the Commissioner in his brief. This is not such a case.

In Zanesville Investment Company, *supra*, the court summarized the legislative purpose of section 269(a) in the following manner:

"We have seen that the principal purpose of Section 269 was to deny those losses, credits, deductions, etc., which could only be obtained by acquiring (generally, by buying) a corporation which, because of its own history, had obtained such benefits and which benefits the acquiring person could not otherwise obtain.

\* \* \* \* \* \*

"\* \* \* The over-all purpose of Section 269 was to prevent distortion of a taxpayer's income resulting from the utilization of *someone else's loss* or a *built-in but unrealized loss* \* \* \*." (Court's emphasis). 335 F.2d at 513–514.

## 2. *What Constitutes a Principal Purpose of Tax Avoidance?*

Initially, maybe the best way to approach the factual question involved in this case is to point out a few of the aspects in which it differs from some of those cases which have been found to have a principal purpose of tax avoidance.

First of all as I have stated, on the basis of the Commissioner's own contentions and the Tax Court's own findings, this is not a case:

1. Where the transaction distorts the liability of the particular taxpayer, *i. e.* a Treas.Reg. 1.269–2(b) case.

2. Where *prima facie* evidence of tax avoidance as the principal purpose of the transaction has been presented or even urged, *i. e.*, a § 269(c) case.

Secondly, this is not a case in which the acquiring corporation or person and the acquired corporation are involved in totally unrelated business pursuits. *See, e. g.*, Borge v. C. I. R., 405 F.2d 673 (2d Cir. 1968), *cert. denied* sub nom Danica Enterprises, Inc. v. C. I. R., 395 U.S. 933, 89 S.Ct. 1994, 23 L.Ed.2d 448 (1969) (entertainment and poultry farms); Ach v. C. I. R., 358 F.2d 342 (6th Cir.), *cert. denied*, 385 U.S. 899, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966) (dress business and dairy); C. I. R. v. British Motor Car Distributors, Inc., 278 F.2d 392 (9th Cir. 1960) (home appliances and autos).

And thirdly, this is not a case in which the acquired corporation is nothing more than a mere "shell." *Compare, e. g.*, Brown Dynalube Co., Inc. v. C. I. R., 297 F.2d 915 (4th Cir. 1962); American Pipe & Steel Corp. v. C. I. R., *supra*; and Vulcan Materials Company v. United States, 308 F.Supp. 53, 58 (N.D. Ala.1969), *with* Naeter Bros. Publishing Co., 42 T.C. 1 (1964). St. Louis was an on-going business enterprise for many years prior to its acquisition. Although the business entity "St. Louis" was liquidated shortly after acquisition, taxpayer attempted to run the business of manufacturing second-quality bricks for over three years as a division of Brumley-Donaldson.

## 3. *What Constitutes a Bona Fide Business Purpose?*

An examination of a few cases in which the Tax Court has found a valid business purpose to exceed in importance any other purpose in the acquisition of a business may aid in the analysis of the facts of this case. In Baton Rouge Supply Co., Inc., 36 T.C. 1 (1961), the stock of the taxpayer, a building supply company, was purchased by the controlling shareholders of an adjacent building and plumbing supply company which needed land for expansion of its very profitable business.

Taxpayer had substantial loss carry-over. Subsequent to the acquisition of taxpayer, the building materials inventory of the profitable acquirer were conveyed to taxpayer and its prior loss carryovers were used to offset its newly profitable business.

In the Tax Court, the taxpayer in *Baton Rouge* put in extensive evidence of its need for more land to expand. There was also testimony that the tax consequences of the transactions were not considered. However, there was also evidence that the consideration paid to acquire taxpayer was substantially disproportionate to the benefit received, including the loss carryovers, within the meaning of § 269(c). The Tax Court chose to believe the taxpayer's testimony concerning its asserted business purpose and its ignorance of the tax consequences. The court further stated that even if the tax consequences had been considered "it does not follow automatically * * * that tax avoidance was the 'principal purpose.' Berland's Inc. of South Bend, 16 T.C. 182 (1951)." Having accepted the bona fides of taxpayer's asserted business purpose, the Tax Court found that the presumption created by § 269(c) had been rebutted.

In Kershaw Mfg. Co., Inc., TC Memo. 1965–44, the Tax Court accepted the testimony of petitioner's officers that the principal reason petitioner, a railroad repair machinery manufacturer, acquired a farm machinery manufacturer was to obtain needed manufacturing space and to diversify its operations. Notwithstanding petitioner's subsequent decision to discontinue operations at the farm machinery plant, the Tax Court found that taxpayer's asserted business purposes were corroborated by its efforts after acquisition to continue with the acquired corporation's business. The Tax Court expressly noted that taxpayer's officers were aware of the available net operating loss carryovers accompanying the acquisition. This fact, however, did not dissuade the court from believing taxpayer's asserted business purposes.

In J. B. Stetson Co., TC Memo. 1964–146, the Tax Court accepted the testimony of petitioner, a hat manufacturer, that its purpose in acquiring a chain of retail men's stores was to preserve a source of distribution for its hats and that tax consequences did not enter into the decision. The Tax Court reached this decision notwithstanding evidence that the department stores had been losing money for years; that petitioner was familiar with their financial situation; and that the benefits received were substantially disproportionate to the consideration paid. Instead, the court found corroborating evidence for petitioner's asserted business purpose in the fact that, subsequent to acquisition, petitioner had analyzed all the stores in an attempt to operate such stores profitably. The Tax Court further noted, citing Hawaiian Trust Co. v. United States, 291 F.2d 761 (9th Cir. 1961) and *Berland's, supra,* that even if the tax consequences had been considered it would not be determinative of the question as to the principal purpose of the acquisition.

### 4. *Analysis of the Tax Court's Decision Below*

The evidence upon which the Tax Court relied in finding that taxpayer failed to carry its burden of proof was comprised of (a) three positive facts thought to be inconsistent with a bona fide business purpose and (b) disbelief of the testimony given by taxpayer's president in support of its asserted business purposes.

Let us examine each of the facts which the Commissioner and the majority of this court contend supports the conclusion that tax avoidance was the principal reason for acquisition.

#### (a) *Positive Evidence Relied Upon by Tax Court*

First, the steady decline in demand for second quality fire-brick. The majority does not explain just how this fact supports a conclusion that tax avoidance "exceeded in importance any other one purpose" in the acquisition.

The Tax Court is more specific. It concludes from the fact found "that it was inevitable that the operations of St. Louis would become unprofitable." They did become unprofitable. A key employee left after the acquisition and took with him a vital fire-brick line. R.T. at 88. A disastrous fire destroyed buildings necessary to St. Louis' operations. Thus, out of the omniscience of hindsight, it is easy to say that St. Louis' operations would become unprofitable.

But in testimony before the Tax Court Brumley was asked how he regarded the acquisition of St. Louis and responded:

"I looked upon it as an absolute necessity in the way of an addition to product sale." R.T. at 100.

He expanded his view by pointing to the need to offer a package to buyers purchasing a refractory product. While Brumley-Donaldson was able to sell a first quality brick it found itself "being hampered by virtue of the limited extent of the second-quality we were able to get at that time." [2] The St. Louis acquisition put it in control of both types of fire-brick. On November 18, 1959, the president of Brumley-Donaldson wrote to one of his officers, ill at the time, to comment on the acquisition of St. Louis saying:

"We believe this will further strengthen and enhance our position of supply for the customers we serve." C.T. at 65.

It seems abundantly clear that as of the date of the transaction the officers and board of Brumley-Donaldson believed that the acquisition of St. Louis would put the company in a better position to serve its customers with a package product.

The second item of evidence which the majority states offers support for the Tax Court's decision is the "steady decline in St. Louis' profitability and sales." Again the record bears this out although the pattern did not appear to be irreversible since there was a profit of $16,818.77 as recently as 1956. The significant fact is not what St. Louis as an independent separate entity had in its future but what the taxpayer believed would happen if St. Louis, as the manufacturer of a related product which was necessary to the Brumley-Donaldson operation, was acquired. The focus on the future of St. Louis as a separate operating unit misses the point. Moreover, such a view does not take into consideration the other collateral advantages which taxpayer obtained. Thus it acquired sole and exclusive control over a necessary railroad spur track, it was able to complete the ownership of the entire block of property which Brumley-Donaldson occupied,[3] and it obtained

---

2. It was explained that in refractory construction the inside of the furnace wall would be lined with two rows of first quality fire-brick and the outside with two rows of second quality brick. R.T. 75. There were only two local sources for second quality brick, St. Louis, which was immediately adjacent to the Brumley-Donaldson plant, and Gladding-McBean, a competitor of Brumley-Donaldson.

3. The Tax Court found that the testimony of the president of Brumley-Donaldson to the effect that the taxpayer needed to acquire property occupied by St. Louis, and thus was one of the important purposes of the acquisition, "was not consistent with the fact that Mesmer, the president of St. Louis, rather than St. Louis, owned the land." The majority finds the Tax Court's rejection of this purpose not erroneous. Neither the Tax Court nor the majority referred to Mr. Brumley's letter of November 18, 1959, itemizing the advantages of the transactions with Mr. Mesmer. He states them as "First" the acquisition of the company; "Third" the arrangements for Mr. Mesmer to personally join the staff of Brumley-Donaldson. The second item is as follows:

"Second, Mr. Mesmer has made it possible for us to complete the ownership of the entire block of property that we presently occupy. This will mean, in effect, that the Company now owns all of the property from Slauson Avenue to Belgrave Avenue and from State Street to the Kobe property line, with

the services of Mr. Mesmer, owner of St. Louis, on its staff. The fact of the matter was that Brumley-Donaldson, if it was to prosper, was required to guarantee to itself a source of supply of second-quality fire-brick. The acquisition of St. Louis put it in that position.

The third and final piece of "evidence" which the Tax Court and the majority rely upon to support the predominate tax avoidance purpose, was the "awareness" by Brumley-Donaldson of the net operating losses of St. Louis. No authority for this somewhat incredible argument is cited by the Tax Court; none is submitted by the Commissioner in his brief, which in fact makes no such argument; and no authority is cited by the majority. Footnote 5 to the majority opinion refers to a statement of this court in Hawaiian Trust Co. v. United States, *supra*, that there had been a stipulation that "no consideration was given by Refiners to the tax aspects of the transaction." A finding that "no consideration" of tax aspects was given is a far different thing than a finding that an "awareness" of operating losses constitutes *evidence* of a purpose for tax avoidance. This must be the grand-daddy of all non-sequiturs.

If authorities are meaningful, and they certainly should be, it is clear from them that the principal purpose of a transaction does not become tax evasion merely because the taxpayer was "aware" of tax consequences or even if such consequences were considered by the parties to the transaction. Hawaiian Trust Co. v. United States, *supra*, 291 F.2d at 765; Baton Rouge Supply Co., Inc., *supra*; J. B. Stetson Co., *supra*; Kershaw Mfg. Co., Inc., *supra*; 7

Merten's Law of Federal Income Taxation, § 38.69, p. 220.

In the complexity of today's business and tax jungle a corporate president who does not obtain tax advice before an acquisition, or merger or substantial dollar transaction ought to be fired. To attach controlling effect from such awareness as to the existence of a purpose to evade or avoid taxes, seems to be a complete departure from business or legal practicality.

Thus the three facts which the Tax Court and the majority of this court rely upon to support the Tax Court's conclusion that tax avoidance was the principal reason for the acquisition (the administrative presumption having disappeared) are simply not sustainable. The decline in demand for second-quality fire-brick might well be a good reason for St. Louis to go out of business; it had nothing to do with Brumley-Donaldson's reason for combining *that* operation with its own high quality operation next door in the hope and expectation of putting together a winning combination. The decline of St. Louis' profitability and sales is in the same category. The "awareness" of Brumley-Donaldson's officers of $59,547.03 of operating losses on St. Louis' books (which, incidentally, were not made available until the acquisition was well along to completion) as evidence of intended tax evasion or avoidance is simply not tenable or supported by the record or by the authorities.

(b) *The Case Made by the Taxpayer*

In the Tax Court taxpayer (via the testimony of its president) asserted three business purposes justifying its acquisition of St. Louis: (1) that it

---

the exception of the Richfield Oil corner. This could not have been accomplished without the understanding cooperation of Mr. Mesmer, who, as I am sure you know, has helped us tremendously in our growth over the past 33 years." C.T. at 65.
To say that there was no evidence that Mr. Mesmer was unwilling to sell the land, absent acquisition of St. Louis, is a

complete misreading of the facts. The land was a part of the St. Louis and Brumley-Donaldson operation. The testimony and the exhibits clearly indicate that the land was a part and parcel of the business and Mesmer's willingness or unwillingness "absent acquisition" is completely unimportant and irrelevant in considering purpose from the position of the acquirer.

wanted to increase its overall foundry business; (2) that it needed the adjacent land upon which St. Louis was situated for expansion of its business; and (3) that it wanted to obtain the services of Mesmer, St. Louis' president. Although any one of these purposes might have been adequate, assuming taxpayer sustained his burden of proof, the Tax Court disbelieved all three. Notwithstanding the fact that only the taxpayer presented testimony concerning the asserted business purposes (the Commissioner submitted no contradicting evidence), the majority would hold that the Tax Court could reasonably disbelieve the taxpayer's testimony because it was inherently improbable and unconvincing, and the court could, therefore, draw negative inferences from the testimony.

Of course, the Commissioner is not required to come forward with witnesses or testimony in support of his determinations or to rebut testimony introduced by the taxpayer. Potts, Davis & Company v. C. I. R., *supra*, 431 F.2d at 1225. But the Tax Court is not free to ignore the uncontroverted testimony of the taxpayer. *Id.* Although the Tax Court is not required to accept uncontradicted testimony by interested witnesses where credibility is in question, Wood v. C. I. R., 338 F.2d 602, 605 (9th Cir. 1964), uncontradicted and unimpeached testimony adduced from interested witnesses, which is not highly or inherently improbable, cannot be arbitrarily disregarded merely because of the identity of the witnesses. Wener v. C. I. R., 242 F. 2d 938, 944 (9th Cir. 1957); Nicholas v. Davis, 204 F.2d 200, 202 (10th Cir. 1953). *See also* Urban Redevelopment Corp. v. C. I. R., 294 F.2d 328, 332 (4th Cir. 1961); and Thomas E. Snyder Sons Co. v. C. I. R., 288 F.2d 36, 39 (7th Cir.), *cert. denied*, 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 28 (1961). Thus, the question is whether the testimony of taxpayer's president, as supported by the other witnesses, is inherently improbable.

The Tax Court disbelieved taxpayer's assertion that it acquired St. Louis to increase its overall foundry business be-cause the court thought the evidence showed an unwillingness to risk much capital to improve the business it had acquired. The court reached this conclusion on the basis of taxpayer's failure to follow recommendations for capital expenditures contained in a study it caused to be made with respect to increasing the sales of second-quality fire-brick. The Tax Court also noted that, in light of the fact that insurance on the acquired buildings and equipment was only $5,000, it could be assumed that equipment for making the bricks had not been extensively renovated.

The very fact that taxpayer caused a study of the acquired business to be made is corroborative of a bona fide business purpose. Similar evidence was considered to be corroborative in J. B. Stetson Co., *supra*. Moreover, it should be pointed out that taxpayer carried on the manufacturing of second-quality bricks for over three years after acquisition of St. Louis. *See* Kershaw Mfg. Co., Inc., *supra*. The fact that this operation showed a profit in only one 6-month accounting period during those three years may be indicative of persistent optimism and also may explain taxpayer's ultimate failure to make the recommended capital expenditures. But this is hardly a very persuasive indication of a principal purpose of tax avoidance. Finally, the record is entirely too sparse to support any rational inference from the minimal amount of insurance coverage which taxpayer carried. There is no evidence as to the insurable value of the fire-brick operation. Without this information, how could the Tax Court know whether $5,000 of coverage was too little, too much, or exactly the degree of risk which a reputable carrier would assume under the circumstances? In light of the above considerations, can it be said that the testimony of taxpayer's president was improbable?

The Tax Court disbelieved taxpayer's assertion that it acquired St. Louis to obtain the adjacent land for expansion because it found that the land was owned by Mesmer individually and not

by the corporation. This has already been discussed, *supra*, at footnote 3. (There is no contention by the Commissioner that the need of land for expansion is not a sufficient business purpose. *Baton Rouge Supply Co., supra,* clearly indicates that such a need is a legitimate purpose.) However, if taxpayer's principal interest was in acquiring only a loss, it would have purchased just St. Louis' stock and not the realty upon which the business was situated.

The Tax Court disbelieved taxpayer's assertion that it wanted the services of St. Louis' president (Mesmer) because he was "unsuccessful" as president at St. Louis. This conclusion, however, is based on a factual assumption for which there is no substantial basis in the record. The Tax Court had no idea whether Mesmer was "unsuccessful" at St. Louis. As pointed out earlier, if industry demand was on the skids, it stands to reason that St. Louis' sales would also suffer. It is unreasonable to assume, without more evidence, that St. Louis' troubles were the product of Mesmer's inept management. For all the Tax Court knew, Mesmer might have prevented the company from going completely under, or from losing an even greater amount of money. In that case, he certainly might be a valuable asset for taxpayer to acquire. At the very least, the testimony of taxpayer's president is not inherently improbable, and in the absence of counter evidence by the Commissioner, the Tax Court should be required to accept it.

### Conclusion

In conclusion, the administrative determination denying the deduction permitted the Commissioner to go to court with a presumption in his favor. The taxpayer introduced evidence both oral and documentary which would have supported a contrary result. The Commissioner produced no witnesses. The testimony of the taxpayer's witnesses was uncontradicted and they were unimpeached. The majority states that the Tax Court could reasonably have con-

cluded that the testimony was "inherently improbable." The Tax Court did not so find, and the majority does not document its conclusion. As I have pointed out, *supra*, in some detail the testimony is not inherently improbable but made good sense. The testimony of Mr. Doolittle, a former employee, corroborates the basic business judgment of Mr. Brumley because he attempted to put the same plan into action—*i. e.*, to combine a sales product "package" of high and low quality brick. The Brumley plan turned out badly because of circumstances occurring later which could not have been foreseen.

Congress has expressly approved the deduction this taxpayer would have used so long as the principal purpose was not tax evasion or tax avoidance. If ever a legitimate and proper reason for the use of this Congressional plan existed, it must be here. The businesses were related, they complemented each other, they logically belonged under one management, they physically adjoined and the basic economics almost required a single operation. The effect of the majority decision is, as to this taxpayer, to repeal the statute.